IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,310

In the Matter of CURTIS N. HOLMES,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 4, 2018. One-year suspension.

*Penny R. Moylan,* Deputy Disciplinary Administrator, argued the case, and *Deborah L. Hughes*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, were on the brief for the petitioner.

*Curtis N. Holmes*, respondent, argued the cause and was on the brief for respondent pro se.

PER CURIAM:  This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Curtis N. Holmes, of De Soto, an attorney admitted to the practice of law in Kansas in 2008. After Holmes appeared in person for a hearing before a panel of the Kansas Board for Discipline of Attorneys, the panel unanimously determined he violated Kansas Rules of Professional Conduct (KRPC) 1.4 (2018 Kan. S. Ct. R. 293) (communication); 1.16(a)(1) (2018 Kan. S. Ct. R. 333) (withdrawing from representation); 5.5(a) (2018 Kan. S. Ct. R. 363) (unauthorized practice of law); 8.1 (2018 Kan. S. Ct. R. 379) (false statement in connection with disciplinary matter); 8.4(c) (2018 Kan. S. Ct. R. 381) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (2018 Kan. S. Ct. R. 381) (engaging in conduct prejudicial to the administration of justice); and Kansas Supreme Court Rule 218(a) (2018 Kan. S. Ct. R. 262) (notification of clients upon suspension).

Before the panel, the disciplinary administrator recommended a 6-month suspension from the practice of law. The panel ultimately recommended a 1-year suspension. At the hearing before this court, the disciplinary administrator endorsed the panel's findings but continued to recommend a 6-month suspension. Holmes filed certain exceptions to the panel's findings, as well as to the recommended discipline. Before the panel and this court, Holmes requested that he be placed on probation. However, he has not complied with Supreme Court Rule 211(g) (2018 Kan. S. Ct. R. 251) requiring him to immediately implement his proposed plan and later provide the Clerk of the Appellate Courts and the disciplinary administrator an affidavit that he is complying with the terms and conditions of the proposed plan.

We hold that clear and convincing evidence establishes the rule violations found by the panel, and we agree with the panel that a 1-year suspension is the appropriate discipline. A minority of this court would impose a less severe sanction.

FACTUAL AND PROCEDURAL BACKGROUND

On January 9, 2017, the office of the Disciplinary Administrator filed a formal complaint against respondent alleging violations of the KRPC. Holmes filed an answer on February 6, 2017, and an amended answer on April 24, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on May 9, 2017, at which Holmes appeared personally.

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"10.     Rule 208(a) requires all attorneys to register with the Clerk of the Appellate Courts and pay the annual registration fee prior to July 1 each year. The rule includes a 'grace' period, providing attorneys until July 31 of each year to forward the form and pay the annual registration fee without penalty. However, '[a]ttorney registration fees received by the Clerk of the Appellate Courts after July 31 of the year in which due shall be accompanied by a $100 late payment fee.' Rule 208(d).

"11.     On July 29, 2015, the respondent mailed his attorney registration form and fee to the Clerk of the Appellate Courts. The Clerk did not receive the respondent's registration form and fee until after July 31, 2015. Under Rule 208(d), the respondent was required to pay a late fee of $100 because the registration form and fee were not received until after July 31, 2015. The respondent failed to provide the late fee of $100.

"12.     On August 8, 2015, the respondent received a letter from the Clerk of the Appellate Courts, sent *via* certified mail, informing the respondent that his registration had not been received before August 1, 2015, and that his license to practice law would be suspended if he did not pay the late fee of $100 within 30 days. The respondent did not pay the late fee of $100 within 30 days.

"13.     On October 6, 2015, the Supreme Court entered an order suspending the respondent's license to practice law for failing to pay the late fee of $100. On October 8, 2015, the Clerk sent the order of suspension to the respondent by certified mail to the respondent at the respondent's registration address. Prior to the entry of the order of suspension, the respondent was on notice that such an order would follow if the respondent did not pay the late fee.

"14.     On October 13, 2015, the United States Postal Service attempted to deliver the certified mailing at 4:32 p.m., leaving a notice.

3

"15.     On October 14, 2015, prior to 10:48 a.m., the respondent called the Clerk of the Appellate Courts and spoke with Debbie Uhl. During the conversation, the respondent stated that he had mailed the registration form and fee in plenty of time to arrive before August 3, 2015, that he had received the notice regarding the late fee, and that he did not believe that he owed the late fee, so he did not send it.

"16.     At the hearing on this matter, the witnesses' testimony varied regarding what Ms. Uhl stated during the telephone conversation. Based on all the evidence presented to the hearing panel, the hearing panel concludes that Ms. Uhl informed the respondent that the Supreme Court had suspended the respondent's license to practice law. Ms. Uhl asked the respondent if he had received the order of suspension. The respondent indicated that he had not received the order of suspension. Thus, despite the fact that the respondent had not yet signed for the certified mail, he had actual knowledge that his license was suspended on October 14, 2015.

"17.     After the respondent's license to practice law was suspended, the respondent continued to practice law in multiple cases, as detailed below.

"18.     G.M., E.M., and El.M. rented property from C.W. C.W. asserted that . . . . G.M., E.M., and El.M. failed to timely pay their rent. As a result, C.W. filed an eviction suit against G.M., E.M., and El.M. Carol Hall represented C.W. in the eviction action. The respondent represented G.M., E.M., and El.M. in the eviction action.

"19.     Additional difficulties arose between the parties, and C.W. filed a protection from stalking case against G.M., Leavenworth County District Court Case No. 2015-DM-828. G.M. then filed a protection from stalking case against C.W., Leavenworth County District Court Case No. 2015-DM-854. Robert H. Hall, Carol Hall's husband and law partner, represented C.W. in the protection from stalking cases.

"20.     On October 14, 2015, the Honorable Michael D. Gibbens held a hearing in the eviction case at 1:00 p.m. While the respondent was in the courtroom shortly before 1:00 p.m., he left the courtroom and went into the hallway to look for his clients just before the case was called. G.M., E.M., and El.M. arrived and met with the respondent regarding the eviction case.

4

"21.    The judge called the case. G.M., E.M., and El.M. did not appear. Additionally, the respondent was not in the courtroom when the judge called the case. As a result, the court entered default judgment and a writ for possession of the premises in favor of C.W. The respondent returned to the courtroom and requested that the court set aside the default judgment. The judge told the respondent that he would have to file a written motion to set aside the default judgment and writ.

"22.    Even though the respondent knew prior to the time of the hearing that his license to practice law had been suspended, the respondent did not inform opposing counsel, the court, or his clients.

"23.    The writ for possession of the premises was served on the respondent's clients. The writ directed the respondent's clients to vacate the premises prior to October 20, 2015, at 11:00 a.m. The order provided that the sheriff's office would remove them at that time if they had not vacated the premises.

"24.    On October 15, 2015, the day after the respondent had actual knowledge of the suspension, the respondent entered his appearance on behalf of V.S., in Johnson County District Court, case number 15CV6206. The respondent sought and obtained a continuance of a hearing that was set for that day. The respondent failed to inform the court, opposing counsel, or his client that his license to practice law had been suspended.

"25.    At the time of the suspension, the respondent represented B.M., a respondent in a domestic case filed in Leavenworth County District Court, case number 2015-DM-356. Lawrence Henderson represented the opposing party. Previously, a status conference had been scheduled for October 15, 2015. The respondent and Mr. Henderson agreed to continue the status conference to October 28, 2015.

"26.    On October 17, 2015, at 9:23 a.m., the respondent signed the certified mail receipt for the suspension order. According to the respondent, the respondent wrote a check in the amount of $100 payable to the Clerk of the Appellate Courts. The Clerk of the Appellate Courts did not receive a check from the respondent dated October 17, 2015.

5

"27.     On October 17, 2015, the respondent served a motion to set aside order for immediate possession and a memorandum in support of motion to set aside order for immediate possession in the eviction action filed against G.M., E.M., and El.M. on C.W. On October 19, 2015, the respondent filed those pleadings in court. Later that same day, the respondent sought and obtained an *ex parte* temporary order setting aside the writ of immediate possession. At the time he served and filed the pleadings and sought the *ex parte* order, the respondent did not inform his clients, opposing counsel, or the court that his license had been suspended.

"28.     Prior to the suspension of the respondent's license to practice of law, the respondent represented R.G. in a domestic case pending in Leavenworth County District Court, case number 2014-DM-904. Pamela Burton represented the opposing party in that case. On October 17, 2015, the respondent served discovery responses in R.G.'s case on Ms. Burton. The respondent filed pleadings in that case on October 19, 2015. The respondent did not inform his clients, opposing counsel, or the court that his license to practice law had been suspended.

"29.     On October 19, 2015, the respondent met with G.M., E.M., El.M., and a deputy with the Leavenworth County sheriff's office about the October 20, 2015, deadline in the writ. Again, the respondent did not inform his clients that his license to practice law had been suspended.

"30.     Previously, the court scheduled a hearing in the protection from stalking cases for October 19, 2015. Prior to the hearing, Mr. Hall saw the respondent at the courthouse. Later, Mr. Hall memorialized the exchange as follows:

'Carol:

'This morning at approximately 10:45 am I went through security at the Justice Center on my way to the PFS hearing concerning the [C.W. and G.M.] PFS case. Mr. Holmes was sitting on the bench just east of the security entrance. After I passed through security I went over to Mr. Holmes to see if he was going to represent [G.M.] in the PFS case. He

6

indicated he was going to represent her and had told her to ask for a continuance since he was waiting for a ride from his wife, due to his car having broken down.

'He launched into speaking about the eviction case where you are representing [C.W.]. He said he had filed a motion to set aside the writ that was issued and had already spoken with Judge Gibbons [*sic*] as well as the sheriff's office. I asked him for a copy of the motion that he filed and told him that you had not received it. He said he "sent it up" and did not have a copy. I handed him a copy of the Order For Immediate Possession that you gave me to give to him. I told him you had tried to fax it, but without success; he said you had to call first, then indicate (I think to his secretary) that you wanted to send a fax, then fax it. He acknowledged having received it by email from you.

'He suggested that the PFS cases should be continued until his client could get moved out. I told him that was a good idea and we agreed on November 16, 2015 for the new date in the PFS cases. I told him I would convey that to Judge Dawson and I did so about 15 minutes later. He indicated that his client had tried to rent another place, but had been declined because on (sic) the pending eviction case. . . . We agreed it would facilitate resolution for his client to get moved out—the sooner, the better—and that, hopefully, we could then resolve the PFS cases by agreement.'

"31.    When Mr. Hall appeared before Judge Dawson to seek and obtain a new hearing date in the two protection from stalking cases, Mr. Hall referenced the agreement with the respondent. The respondent, however, did not appear in court. The respondent did not inform his clients, Mr. Hall, or the court that the respondent's license had been suspended.

"32.    On October 19, 2015, the court entered orders continuing the protection from stalking cases to November. In the orders, the respondent is listed as G.M.'s counsel.

7

"33.     During the afternoon hours of October 19, 2015, Ms. Hall emailed the respondent to set a date for a hearing in the eviction action. In the email, Ms. Hall proposed several dates, including October 23, 2015. The respondent called Ms. Hall and agreed to an expedited hearing on October 23, 2015, at 11:00 a.m. The respondent did not tell Ms. Hall that his license was suspended.

"34.     At the time his license was suspended to practice law, the respondent represented G.B. in an appeal from a municipal court conviction, Leavenworth County District Court case number 2015-CR-573. Previously, the court had scheduled a trial for October 20, 2015. On October 20, 2015, the respondent sought and obtained opposing counsel's consent and continued the trial to November, 2015. The respondent did not inform opposing counsel, the court, or his client that his license to practice law was suspended.

"35.     On October 22, 2015, the respondent wrote a check in the amount of $100 payable to the Clerk of the Appellate Courts. The respondent delivered the check to the Clerk of the Appellate Courts.

"36.     On October 22, 2015, the respondent called Ms. Hall and left a message asking Ms. Hall to call him regarding the eviction case. Ms. Hall replied to the message by email that same day asking the respondent to draft an agreement.

"37.     On October 23, 2015, the Leavenworth County District Court Administrator informed Judge Michael D. Gibbens that the respondent's license to practice law was suspended. The hearing in the eviction action was scheduled to be heard in Judge Gibbens' court at 11:00 a.m. that day.

"38.     Ms. Hall had several hearings before Judge Gibbens on October 23, 2015, prior to the 11:00 a.m. setting. Before the 11:00 a.m. hearing, Judge Gibbens informed Ms. Hall the respondent's license to practice law was suspended.

"39.     The respondent arrived for the hearing shortly before 11:00 a.m. and entered the courtroom. The respondent approached Ms. Hall and asked her to come to

8

speak with him in the hallway. In the hallway, the respondent told Ms. Hall that his license to practice law was suspended. The respondent told Ms. Hall that he had just learned of the suspension a day or so prior and was reluctant to leave a phone message to that effect. The respondent asked Ms. Hall to cancel the 11:00 a.m. hearing and to agree to allow his clients until the following Monday to vacate the premises. The respondent's clients were not present.

"40.     Ms. Hall informed her client of the respondent's offer. Her client declined the offer. Shortly after 11:00 a.m., on October 23, 2015, Judge Gibbens entered the courtroom. The respondent was in front of the bar at counsel table when the following exchange occurred:

> 'JUDGE GIBBENS: Be seated. All right, Mr. Holmes, before I call this case, the Court's been advised that you were administratively suspended from the practice of law effective October the 6th.

> 'MR. HOLMES: Right. I became aware of that in the last few days.

> 'JUDGE GIBBENS: Okay. Have you been reinstated yet?

> 'MR. HOLMES: I've done everything I can. I've actually been advised it's been processed and it should be effective Monday.

> 'JUDGE GIBBENS: Okay. Well, you can't appear here today.

> 'MR. HOLMES: I understand. I've been advised by the Disciplinary Administrator the thing I need to do is to show up and let the Court know that, let opposing counsel know that. I would have let my client know that but I can't get ahold of them and they're not present.

9

'JUDGE GIBBENS:  All right.

'MR. HOLMES:  But I will be doing that. And I have discussed the matter with Ms. Hall.

'JUDGE GIBBENS:  All right. You may withdraw then. Thank you.

'MR. HOLMES:  Thank you.'

"41.     After the respondent left the courtroom, the court entered a default order for immediate possession and issued a writ against the respondent's clients to vacate the premises.

"42.     Later that day, October 23, 2015, the respondent came to Ms. Hall's office to deliver a client file to Mr. Hall in an unrelated case. Ms. Hall came to the reception desk and took the file from the respondent. The respondent began to discuss the eviction action with Ms. Hall. Because the respondent was not licensed to practice law, Ms. Hall told the respondent that he needed to leave.

"43.     On October 23, 2015, the respondent sent a letter to the disciplinary administrator, self-reporting his conduct. The respondent's letter provided:

'Please be advised that in the hopes of compliance with the rules of professional conduct, I am providing notice of a handful of matters in which I appeared in Court to represent clients which occurred apparently *after* the entry of an order regarding but *prior* to my notification of an administrative suspension.

'Pursuant to the Supreme Court Rules regarding annual registration, I mailed my Attorney Registration documents and fees on the 29th day of July, 2015. I had anticipated they would be received on or before the 31st day of July, 2015, in time to renew my registration before being deemed late. **However, a few weeks later, I received a**

10

**notice by certified mail that my registration renewal documents were not processed until Monday, August 3rd, 2015, and were therefore deemed late.**

'I thereafter attempted to contact the registration office to object and/or to request a further explanation for the late fee. I cannot recall the precise date of the call but believe it was in late August. In any event, I had hoped to avoid having to send the late fee if I could receive a better explanation for the delay and possibly have the determination reversed. I did not receive a follow-up response from the registration office, and admittedly I waited to follow up on the issue until thirty (30) days had lapsed.

**'Nevertheless, I again called and poke [*sic*] with the registration clerk about the same issue, I believe on October 14th,** and was advised the registration office could provide me no precise explanation for the processing delay but that it was possible the registration renewal documents were either received late, or they had been received on time but were left in the lock box until they could be processed after the weekend of August 1st and 2nd, 2015. I was then informed that I would be contacted by an individual who could better explain or resolve the matter the following day; however, as of this date I have received no such contact.

**'Although I was aware that it had been more than thirty (30) days since I had been notified of the late fee issue, I ultimately prepared and mailed the late fee payment with the additional form to the registration office the same day.** I had hoped that despite the delay, I might be able to avoid an administrative suspension. In over twenty (20) years of practice, I have never incurred this issue and so I was uncertain as to how the entire process worked.

11

'Unfortunately, I received notice of the suspension a few days later on October 17th, 2015. After reviewing the information, I immediately prepared and sent the reinstatement fee. I also sent the Continuing Legal Education reinstatement fee. I only learned after sending the reinstatement fee, that it had been received by the registration office but that they had not received the late fee I had mailed days earlier. Accordingly, I immediately wrote and delivered another check for the late fee. Accordingly, I have undertaken all action to reinstate my license, which by this time may already be reinstated or, as I have been advised, should be reinstated imminently. However, as of the current date, I still have no knowledge as to whether the late fee sent nearly a week and a half ago was ever received, which further concerns me given the original delay in having the initial renewal fee payment processed.

'In any event, to my knowledge, there are no other impediments to my license other than the late payment fee issue, and the delay was largely occasioned as a result of the fact that I did not believe I [*sic*] payment would be received late in the first place, and my admitted stubbornness over the issue.

'I understand that an administrative suspension order was issued on October 5th or 6th, 2015; however, it was only after I received the notice of suspension that I became aware it had actually been issued. As such, after the order was issued but prior to my notice thereof I admittedly appeared in state court to represent clients on a handful of occasions. The first occasion was October 6th, 2015, in Leavenworth County, . . . The matter concerned a Motion to Determine Child Support Arrearages which I had filed some months earlier. The hearing merely consisted of notification to the Court that the parties had reached a previously negotiated agreement. The second hearing was on October 7 in two related child in need of care cases also in Leavenworth County. My client did not appear, and the matters were essentially continued until

12

the month of November. The third matter was another child in need of care case held in Johnson County on October 8th, 2015, where I merely appeared and indicated my intention to withdraw and was excused by the Court. The fourth hearing . . . was held on October 15th and considered a temporary protection order which had been initially filed on a *Pro Se* basis . . . who asked that I appear on her behalf at the hearing. [She] had also filed a Motion to Modify Custody in a companion domestic case which she also wished me to handle but which was not scheduled at that time. The hearing was continued and the Judge expressed his intention to appoint a Guardian Ad Litem to represent the interests of the children for whom the temporary protection order had been issued. The final hearing involved the sentencing . . . on October 16th, in Olathe Municipal Court. The sentencing was based upon a plea and sentencing agreement which had been negotiated earlier.

'I would not have appeared in any of these hearings had I actually been aware of the administrative suspension, and **I have not appeared in any further hearings since [having] been notified of the administrative suspension.** In addition, there have been no formal disciplinary proceedings filed in the State of Kansas against me at any time and to my knowledge there are no matters pending.

'Should you have any questions regarding this matter please fee [*sic*] free to contact me.'

"44.     The respondent included false information in his October 23, 2015, letter to the disciplinary administrator. *See* ¶ 65.

"45.     On October 26 or 27, 2015, the respondent called Mr. Henderson and asked if he would agree to continue the October 28, 2015, hearing scheduled in G.M.'s case. The respondent explained that he needed the continuance because his daughter was getting married in Idaho on October 28, 2015. The respondent did not disclose that his license to practice law was suspended. However, Mr. Henderson had previously learned that the respondent's license was suspended. Mr. Henderson did not agree to the

13

continuance, because he was concerned that by agreeing to the continuance he would be aiding the respondent in the unauthorized practice of law.

"46.     On October 27, 2015, Kate Baird, deputy disciplinary administrator, responded to the respondent's letter self-reporting the misconduct. In the letter, Ms. Baird believing that the respondent has not practiced law after learning of the suspension order, told the respondent that she would hold the matter and asked the respondent to provide her with written notification when his license was reinstated.

"47.     On October 28, 2015, [the] Supreme Court issued an order reinstating the respondent's license to practice law in Kansas.

"48.     On November 6, 2015, the respondent notified the disciplinary administrator that his license had been reinstated. In that letter, the respondent disclosed additional misconduct, as follows:

'Thank you for your letter dated October 27th, 2015. Per your request, I am advising that I received the reinstatement order and was reinstated to practice on October 28th and have resumed practice.

'I should also advise in connection with my prior letter that I had also prepared and filed a few pleadings after the October 6th, 2015, period of suspension. **As you may recall, I did not receive any notice thereof until late afternoon of [the] 17th of October.**

'In a Johnson County divorce case No. 15-CV-6299 I entered an appearance and submitted an Answer to a Petition and a Motion to Set-Aside Temporary Orders on or about October 14th; however, this was prior to my receipt of the notice of suspension and upon my subsequent notification of the suspension, **I appeared in person at a previously scheduled hearing the following week and advised the Court and counsel as well as my client of the suspension.** The hearing was then continued for a few weeks.

14

'I also prepared and filed a Motion to Set-Aside [*sic*] a Default Judgment in a Leavenworth County wrongful detainer case No. 2015-LM-952. The Motion was also prepared and signed prior to the time I received my notice, but it was received by the Court Clerk and filed the following Monday and thereafter scheduled by the Court for an expedited hearing to take place on the 23rd of October. **Nevertheless, on that date I appeared in Court just prior to the time scheduled for the hearing and notified the Court and Counsel of my administrative suspension.** I had been unable to reach my clients prior to that time who, I later learned, were actually in the process of relocating from the residence which was the subject of the action and could not be reached by telephone. Nevertheless, the matter proceeded to a second default after I was excused from the Courtroom by the Court.

'In addition, I received answers from my client by e-mail to a series of discovery requests in Leavenworth Case No. 2014-DM-904. I prepared a formal discovery response which was e-mailed to opposing counsel on October 9th. The discovery answers were later signed by me and verified by my client also prior to my receiving notice of the suspension, but they were deposited in the mail, together with several items of personal mail, the day after I had received notice. I have no excuse for having these items mailed out after I had received notice other than the fact that they had been prepared and included a couple of days earlier together with a large stack of personal mail all of which was sent out at the same time. This was an oversight on my part and was not intentional as it would have been just as easy to have waited to send the discovery answers out until the following week after I received the reinstatement.

'In a criminal case, Leavenworth County Case No. 15-CR-573, a court trial had been scheduled several weeks earlier to take place on the 21st of October. I was unable to contact the Judge to notify him of my administrative suspension; however, with the consent of opposing

counsel the matter was continued prior to the day of the trial and rescheduled for [the] 17th day of December.

'I submitted no other pleadings of which I am aware, nor did I appear at any other hearings about which I have not previously advised your office. I can say, if there were any such additional matters to speak of, I can represent that none of them were conducted after my receipt of the notice of suspension.

'Should you have any questions regarding this matter, please [feel] free to contact me.'

"49.     The respondent's November 6, 2015, letter to the disciplinary administrator's office contained false information. *See* ¶ 66.

"50.     On November 4, 2015, Ms. Hall filed a complaint with the disciplinary administrator regarding the respondent's unauthorized practice of law.

"51.     On November 16, 2015, Ms. Burton filed a complaint with the disciplinary administrator regarding the respondent's unauthorized practice of law.

"52.     On December 3, 2015, the respondent wrote to the disciplinary administrator's office, responding to Ms. Hall's complaint and Ms. Burton's complaint. In the respondent's correspondence to the disciplinary administrator's office, the respondent again made false statements.

"53.     In the respondent's December 3, 2015, letter to the disciplinary administrator's office, the respondent admitted that he violated KRPC 3.3 (by omission), KRPC 3.4(c), and KRPC 5.5.

16

"54.     Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.4, KRPC 1.16, KRPC 5.5, KRPC 8.1, KRPC 8.4, and Rule 218, as detailed below.

"KRPC 1.4

"55.     KRPC 1.4 provides:

'(a)     A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

'(b)     A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.'

"56.     The respondent violated KRPC 1.4 by failing to inform his clients that his license to practice law had been suspended. Because the respondent failed to notify his clients of the suspension of his license, his clients were not able to make informed decisions regarding the representation. The hearing panel concludes that the respondent violated KRPC 1.4.

"KRPC 1.16

"57.     After the respondent's license to practice law was suspended, the respondent owed certain obligations to his current clients. Specifically, KRPC 1.16(a)(1) provides:

'Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the rules of professional conduct or other law.'

17

"58.     In this case, despite that his license to practice law was suspended, the respondent continued to represent his clients and did not withdraw from the representations as required by KRPC 1.16(a)(1). As such, the hearing panel concludes that the respondent violated KRPC 1.16(a)(1).

"KRPC 5.5

"59.     KRPC 5.5(a) prohibits the unauthorized practice of law. Additionally, Rule 208(e) provides that 'the practice of law after suspension constitutes a violation of KRPC 5.5' and Rule 218(c) provides that '[i]t is the unauthorized practice of law and a violation of KRPC 5.5 for . . . a suspended . . . attorney to practice law after the Supreme Court enters an order suspending . . . the attorney.'

"60.     In his December 3, 2015, letter, the respondent admitted to intentionally practicing law at a time when his license to do so had been suspended:

'. . . That being said, I fully admit that the Motion and Memorandum were later filed the morning of October 19th, 2015. These were filed along with a Certificate of Service for some discovery answers which had originally been emailed to opposing counsel on October 9th, 2015.

'I found myself caught in a proverbial Catch 22 situation, and I acted as I believed was in my client's and not my own best interests at the time.'

"61.     On October 6, 2015, the Supreme Court issued an order suspending the respondent's license to practice law. After the Supreme Court suspended the respondent's license to practice law, the respondent continued to practice law. In addition to the matters disclosed in his October 23, 2015, self-report letter, the respondent also engaged in the following unauthorized practice of law:

a.     On October 14, 2015, the respondent met with G.M., E.M., and El.M. regarding the eviction case. The respondent requested that the judge set

18

aside the default judgment and the writ for possession of the premises. *See* ¶¶ 20, 21.

b.       On October 15, 2015, the respondent entered his appearance on behalf of V.S. and obtained a continuance of a hearing that was set for that day. *See* ¶ 24.

c.       On October 15, 2015, the respondent discussed his representation of B.M. with Mr. Henderson and entered into an agreement to continue the status conference set that day. *See* ¶ 25.

d.       On or after October 14, 2015, the respondent drafted a motion and memorandum to set aside the order for immediate possession. On October 17, 2015, the respondent served a motion and memorandum to set aside the order for immediate possession in the eviction case against G.M., E.M., and El.M. *See* ¶ 27.

e.       On October 17, 2015, the respondent served discovery responses on the opposing party in R.G.'s case. *See* ¶ 28.

f.       On October 19, 2015, the respondent filed pleadings in R.G.'s case. *See* ¶ 28.

g.       On October 19, 2015, the respondent filed the motion and memorandum to set aside the order for immediate possession in the eviction case. The respondent also sought and obtained an *ex parte* order granting his motion to set aside the order for immediate possession. *See* ¶ 27.

h.       On October 19, 2015, the respondent met with G.M., E.M., and El.M. regarding the deadline in the writ[]for immediate possession. *See* ¶ 29.

i.       On October 19, 2015, the respondent discussed the eviction case and the PFS cases with Mr. Hall. *See* ¶ 30.

j.      On approximately October 19, 2015, the respondent spoke with Ms. Hall regarding the eviction case and agreed to a hearing date of October 23, 2015. *See* ¶ 33.

k.      On October 20, 2015, the respondent sought and obtained opposing counsel's agreement to continue a trial scheduled for that day to November, 2015, in a case involving G.B. *See* ¶ 34.

l.      On October 22, 2015, the respondent called Ms. Hall regarding the eviction case. *See* ¶ 36.

m.      On October 23, 2015, the respondent asked Ms. Hall to continue the hearing set in the eviction case. *See* ¶ 39.

n.      On October 23, 2015, [the respondent] appeared in Judge Gibbens court for the eviction hearing. *See* ¶ 40.

o.      On October 23, 2015, the respondent went to Mr. and Ms. Hall's law office. The respondent delivered a client file to Mr. Hall. The respondent attempted to discuss the eviction action with Ms. Hall. *See* ¶ 42.

p.      On October 26 or 27, 2015, the respondent contacted Mr. Henderson regarding G.M.'s case, seeking an agreement to a continuance of a hearing scheduled for October 28, 2015. *See* ¶ 45.

"62.      Because the respondent continued to practice law after his license was suspended, the hearing panel concludes that the respondent violated KRPC 5.5(a).

20

"KRPC 8.1 and KRPC 8.4(c)

"63.     Engaging in dishonest conduct is a serious violation of the Kansas Rules of Professional Conduct. KRPC 8.1 prohibits engaging in dishonest conduct in connection with a bar application or a disciplinary matter:

'An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a)     knowingly make a false statement of material fact; or

(b)     fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.'

KRPC 8.4(c) prohibits dishonest conduct generally. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.'

"64.     The respondent sent three letters to the disciplinary administrator's office regarding his conduct in this case. In each of the letters, the respondent made misrepresentations and omitted material information necessary to prevent a misapprehension of the facts.

"65.     The respondent's October 23, 2015, letter included false statements:

a.     The respondent stated, 'However, a few weeks later, I received a notice by certified mail that my registration renewal documents were not processed until Monday, August 3rd, 2015, and were therefore deemed late.' The respondent's statement is false. He received the certified mail five days after his registration was received, on August 8, 2015.

21

b.     The respondent asserted that he mailed a check on October 14, 2015:

'Nevertheless, I again called the poke [*sic*] with the registration clerk about the same issue, I believe on October 14th, . . .

'Although I was aware that it had been more than thirty (30) days since I had been notified of the late fee issue, I ultimately prepared and mailed the late fee payment with the additional form to the registration office the same day.'

However, during his testimony on this same subject, he testified:

'It was also my understanding that the first part of October there would be—the suspensions would be processed at some time after that, and come the first week in October I had kind of a come to Jesus moment, so to speak, and basically thought I better get my late fee out. In fact, I did so. That would have been—it's referenced in Respondent's Exhibit No. 1. It would have been check No. 2254.

'What's interesting about this is, in fact, while all of the checks before and after 2254 were processed, 'um, that particular check was not, and that would have been the late fee. 'Um, and I don't know what happened to it. That, I cannot account for.

. . . .

22

'As a consequence that—the late fee check would have been mail[ed]. And, again, I'm not certain of the date, but somewhere between the 9th, 10th, at the latest, at the very latest the 13th of October of 2015.

'That would coincide with the telephone call that I made to the registration office having sent the check out, and basically trying to, I guess, kind of intercept it. . . . The late fee had been sent, but I was hoping that I could avoid negotiating it.'

Either the respondent's statement in his letter that he mailed the check 'the same day' as his October 14, 2015, conversation with the attorney registration office or his statement that he mailed it between October 9, 2015, and October 13, 2015, must be false.

c. The respondent's statement that he had 'not appeared in any further hearings since being notified of the administrative suspension' was also false, as the respondent appeared in court the same day he forwarded his self-report letter to the disciplinary administrator's office.

d. Finally, despite the date of the respondent's letter, the respondent failed to disclose his extensive unauthorized practice of law which occurred October 17, 2015, through October 23, 2015. For example, as later disclosed in his December 3, 2015, correspondence:

'. . . That being said, I fully admit that the Motion and Memorandum were later filed the morning of October 19th, 2015. These were filed along with a Certificate of Service for some discovery answers which had originally been emailed to opposing counsel on October 9th, 2015.'

23

Moreover, the respondent also engaged in the unauthorized practice of law as detailed in ¶¶ 21-42 above. In this regard, the respondent's letter is false by omission.

"66. The respondent's November 6, 2015, letter also contained false information:

a. The respondent stated that he did not receive notice of the suspension until late afternoon on October 17, 2015. First, the respondent was on notice beginning in August that his license would be suspended if he failed to pay the late fee. Second, Ms. Uhl told the respondent on October 14, 2015, that his license was suspended. Third, on October 13, 2015, the United States Postal Service attempted to deliver the order of suspension. Finally, on October 17, 2017, at 9:23 a.m., the respondent signed for the certified mailing which contained the order of suspension.

b. The respondent stated that he advised the court that his license to practice law had been suspended. The respondent did not advise the court; rather the court advised the respondent that the court learned that the respondent's license had been suspended.

"67. Finally, the respondent made false statements in his December 3, 2015, letter to the disciplinary administrator:

a. The respondent falsely stated, '[w]eeks later I learned the reinstatement had not been processed until August 3rd.' The respondent signed for a certified mailing on August 8, 2015, which included information notifying the respondent that his registration was late and a late fee was required.

b. The respondent also stated, 'I prepared and mailed the late fee I believe either the first full week or the first of the second full week in October.' Either this statement is false or the respondent's statement in Exhibit 1 that he mailed a check to cover the late fee the same day he spoke to the registration clerk (October 14) is false. *See* ¶ 65(b) above.

24

c.      The respondent's statement that 'the notice came as a somewhat unexpected surprise to me at the time,' is at least disingenuous, if not actually false. First, he is charged with knowing the rules which govern our profession. Second, he received a notice on August 8, 2015, that his license would be suspended if he did not forward a late fee within 30 days, which he knew he did not [d]o. Third, Ms. Uhl told the respondent[] his license was suspended on October 14, 2015.

d.      The respondent stated:

'. . . Prior to the hearing, I formally advised the [*sic*] Judge Gibbens of the administrative suspension, and he asked me if I had been reinstated, I informed him that to my knowledge the reinstatement order had not been issued but that based upon my previous conversations with the registration office it would probably be reinstated the following Monday, October 26th, 2015.'

And, 'I would also note that I did notify the Court and counsel of the administrative suspension on October 23rd, 2015, with the understanding at the time that they were not aware.' Again, the respondent did not notify Judge Gibbens of the suspension. Rather, at the outset of the October 23, 2015, hearing, Judge Gibbens informed the respondent that he had been informed that the respondent's license to practice law was suspended.

"68.    Accordingly, the hearing panel concludes that the respondent repeatedly made false statements in his letters to the disciplinary administrator's office in violation of KRPC 8.1 and KRPC 8.4(c).

"KRPC 8.4(d)

"69.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d).

"70.    The respondent engaged in conduct that was prejudicial to the administration of justice when he failed to inform the courts, opposing counsel, and his clients that his license to practice law had been suspended. Additionally, hearings were postponed and clients, opposing counsel, and courts were burdened with needless appearances and extensions of time. Moreover, the respondent engaged in conduct that is prejudicial to the administration of justice when he filed pleadings and appeared in court on behalf of clients after his license to practice law was suspended. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"Rule 218

"71.    After an attorney's license has been suspended by the Supreme Court, the attorney is required, by court rule, to take certain action:

'(a)    Attorney's Duty. When the Supreme Court issues an order or opinion suspending or disbarring an attorney or striking the attorney's name from the roll of attorneys, the attorney must, within 14 days of the order or opinion:

(1)    notify each client, in writing, that the attorney is suspended, disbarred, or is no longer authorized to practice law and the client should obtain new counsel;

(2)    notify all opposing counsel, in writing, that the attorney is suspended, disbarred, or is no longer authorized to practice law;

(3)    notify all courts where the attorney is counsel of record and the chief judge of the district in which the attorney resides, in writing, that the attorney is suspended, disbarred, or is no longer authorized to practice law;

26

(4) file a motion to withdraw in each case in which the attorney is counsel of record . . . .'

"72. In this case, the respondent failed to notify each client in writing that his license to practice law was suspended, in violation of Rule 218(a)(1). Additionally, the respondent also failed to notify all opposing counsel in writing that his license to practice law was suspended, in violation of Rule 218(a)(2). (The only time the respondent notified anyone of the suspension was on October 23, 2015, when the respondent albeit untimely, orally notified Ms. Hall that his license to practice law had been suspended.) The respondent failed to notify all courts where the respondent was counsel of record and the chief judge of the district where the respondent resides that his license to practice law was suspended, in violation Rule 218(a)(3). Finally, the respondent likewise failed to file motions to withdraw in each case in which the respondent was counsel of record, in violation of Rule 218(a)(4). The hearing panel concludes that the respondent repeatedly violated Rule 218(a)(1), Rule 218(a)(2), Rule 218(a)(3), and Rule 218(a)(4).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"73. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"74. *Duty Violated*. The respondent violated his duty to the public and the legal profession to maintain his personal integrity. The respondent also violated his duty to his clients and to the legal system to proper[l]y communicate. Finally, the respondent violated his duty to the legal system to comply with court rules.

"75. *Mental State*. The respondent knowingly violated his duties.

27

"76.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to his clients, opposing counsel, courts, and the administration of justice.

"77.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.    Prior Disciplinary Offenses. The respondent has been previously disciplined on two occasions. On July 25, 2005, the Idaho Supreme Court suspended the respondent's license to practice law in the State of Idaho for a period of 15 months. Following 11 months of actual suspension, respondent was placed on probation for a period of one year, for having violated Rule 1.1, Rule 1.3, Rule 1.4, Rule 1.7(b), and Rule 8.4(c). On December 31, 2013, the disciplinary administrator informally admonished the respondent for having violated KRPC 8.4(d).

b.    Dishonest or Selfish Motive. The respondent's misconduct was motivated by dishonesty and selfishness as he provided false and self-serving information to the disciplinary administrator's office. Further, the respondent has minimized his misconduct throughout these proceedings. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness.

c.    A Pattern of Misconduct. The respondent repeatedly provided false and misleading information to the disciplinary administrator's office regarding his knowledge of the suspension and the extent of his unauthorized practice of law. Thus, the respondent has engaged in a pattern of misconduct.

d.    Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.4, KRPC 1.16, KRPC 5.5, KRPC 8.1, KRPC 8.4, and Rule 218. Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

28

e.    Submission of False Evidence, False Statements, or Other Deceptive Practices during the Disciplinary Process. In his written correspondence to the disciplinary administrator's office during the investigation as well as throughout the disciplinary proceedings, the respondent misrepresented facts stated and omitted facts necessary to prevent a misapprehension of the facts. During his closing argument, the respondent acknowledged that he has emotional difficulty handling the truth:

'With respect to the conversation with Ms. Uhl, I didn't call because I received notice, I called because I had sent out a late fee. Whether you choose to believe that or not, you're going to believe what you believe, but that was the purpose of the conversation. I think it could be interpreted either way, but I was calling to say, you know, I sent in a late fee, I'm trying to avoid the late fee before suspension comes out, is there a way for me to deal with this? I haven't gotten a suspension order, but I'd like to be able to deal before I do.

. . . .

'. . . I—in hindsight, hindsight is 20/20, there's a lot of things I could have done. But when you're in the moment, you act, sometimes in desperation, sometimes out of panic. You don't set out to do anything wrong. You don't set out intentionally— this wasn't like I was going in to rob a bank, any plan like that. This is something that came as a bit of a surprise, and I tried to protect my client. I was acting in their behalf. At least that was my intention. This was not something I was doing for myself.

'I was dishonest with regards to acting on behalf of my client where I knew that the license had been suspended, but the prior week it was more negligent. This wasn't something that I actually knew. It's something that I should have known, perhaps should have made myself aware of, should have thought through.

29

Again, hindsight is 20/20, and you kick yourself every time you think of what should have happened.

'I didn't appreciate the effect that it would have [on] my clients. I think, perhaps, the full extent not even until today. 'Um, I don't know how much more my clients would have done, or could have done, had they known any sooner, but I didn't tell them early enough. And we're talking about days here. This is not something that was a long period of time. From beginning to end, we're talking about a couple weeks. And so that period, yeah, I didn't act as I should have. And there are things I could have done proactively weeks earlier, as I've indicated.

**'Do I acknowledge, absolutely. Did I acknowledge everything at the time that I sent in some self-reports, probably not. Again, it was my way of dealing with it. I didn't—I simply couldn't do everything, say everything. 'Um, it came out in fits and spurts. 'Um, it's still coming out. I didn't make what I perceived to be a material misrepresentation in any of those reports. There's no flat out lie anywhere. Did I under report? I did. And I think that was, again, not because I was out to do that, but because I simply had difficulty emotionally handling it.**

'One thing that I need to be clear on, 'um, and then I think it came out, I did indicate, in those reports, that I had told Judge Gibbens that I had been suspended. This is not something that I was out to misrepresent. That was simply my recollection. 'Um, turns out I was mistaken, but this was not an intentional misrepresentation. And I think, again, it was based upon what was my intention of going in.'

The hearing panel would like to point out that the respondent acknowledged that he (unintentionally) misrepresented reporting to the court that he was suspended.

30

The respondent minimized this misrepresentation by stating that he was simply mistaken. The appearance before the court occurred on October 23, 2015. In his November 6, 2015, supplemental self-report, the respondent stated:

> '[O]n that date I appeared in Court just prior to the time scheduled for the hearing and notified the Court and Counsel of my administrative suspension.'

A review of the transcript of the proceedings before Judge Gibbens shows that at the outset of the proceedings, the judge informed the respondent that he learned that the respondent's license was suspended and the judge did not allow the respondent to make an appearance. Whether the respondent informed the court is relevant under Rule 218(a). The hearing panel is troubled by this statement which serves as a repeated example of the respondent's continuous minimization of his misconduct.

   f.  <u>Substantial Experience in the Practice of Law</u>. The Idaho Supreme Court admitted the respondent to practice law in the State of Idaho in 1991. Considering the prior Idaho suspension, at the time of the misconduct in this case, the respondent had been practicing law for approximately 25 years. The respondent has nine years of practice in Kansas.

"78. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found no mitigating circumstances present.

"79. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.11 Disbarment is generally appropriate when:

  . . .

31

(b)     a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious[ly] adversely reflects on the lawyer's fitness to practice.

'5.13   Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'6.11   Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

'6.12   Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.21   Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding.

'6.22   Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

'7.2   Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

Unfortunately, the ABA Standards do not provide clear guidance in this case. The respondent's conduct fits in standards which indicate reprimand, suspension, and disbarment.

"*Recommendation of the Parties*

"80.   The disciplinary administrator recommended that the respondent be suspended from the practice of law for no less than 6 months.

"81.   The respondent recommended that his plan of probation be adopted and that he be allowed to continue to practice law. The respondent also suggested that the hearing panel add additional terms to his plan of probation.

"82.   Because the respondent requested that he be placed on probation, the hearing panel must consider the provisions of Rule 211(g)(3). That rule provides:

'(3)   The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)   the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)   the Respondent puts the proposed plan of probation into effect prior to the hearing on the

33

Formal Complaint by complying with each of the
terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation;
and

(iv)    placing the Respondent on probation is in the best
interests of the legal profession and the citizens
of the State of Kansas.'

"83.    While the hearing panel finds that the respondent timely filed his plan of probation, the hearing panel finds that the respondent's plan of probation is not workable, substantial, and detailed as required by the rule, in that the plan does not provide terms and conditions to ensure that the misconduct is not repeated and that his clients, the courts, and the legal system are properly protected.

"84.    The hearing panel also concludes that the plan of probation was not put into effect prior to the hearing by complying with each of the terms and conditions.

"85.    Additionally, the misconduct in this case cannot be corrected by probation. The hearing panel finds that the respondent's misconduct includes dishonest conduct. Previously, the Supreme Court found that probation is not appropriate when dishonest conduct is involved. *In re Stockwell*, 296 Kan. 860, 295 P.3d 572 (2013) (Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.).

"86.    Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas.

"87.    The respondent's written communications with the disciplinary administrator's office, at best contained material misrepresentations of fact and at worst, were deliberate attempts to hide the truth from the disciplinary administrator's office. By omitting a large number of relevant facts and by minimizing other facts, the respondent

34

clearly made numerous false representations and inferences of material fact. Such conduct is unacceptable in a practicing attorney. During his closing argument, the respondent attempted to explain that these resulted from his emotional difficulty in acknowledging the truth in this case. See ¶ 77(e) above.

"88.    An attorney's word must be his bond. When an attorney cannot be trusted to be honest and complete in the recitations of facts, the attorney should no longer be entrusted with a license to practice law.

"89.    Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of one year. The hearing panel further recommends that prior to reinstatement, the respondent be required to undergo a hearing pursuant to Rule 219. At the reinstatement hearing, the hearing panel recommends that the respondent provide clear and convincing evidence that he no longer has emotional difficulty handling the truth.

"90.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

35

Holmes was given adequate notice of the formal complaint, to which he filed an answer. He was also given adequate notice of the hearing before the panel where he appeared in person. Holmes filed exceptions to the final report of the panel on October 27, 2017. When exceptions are taken to a hearing panel report, "[t]his court does not reweigh the evidence or assess the credibility of witnesses. 'Rather, this court examines any disputed findings of fact and determines whether clear and convincing evidence supports the panel's findings. If so, the findings will stand. [Citations omitted.]'" *In re Hawkins*, 304 Kan. 97, 117-18, 373 P.3d 718 (2016) (quoting *In re Trester*, 285 Kan. 404, 408-09, 172 P.3d 31 [2007]); see *In re Bishop*, 285 Kan. 1097, 1105-06, 179 P.3d 1096 (2008).

While Holmes filed exceptions to certain of the panel's findings of fact, he does not contest the panel's conclusions that he violated KRPC 1.4 (2018 Kan. S. Ct. R. 293) (communication); 1.16(a)(1) (2018 Kan. S. Ct. R. 333) (withdrawing from representation); 5.5(a) (2018 Kan. S. Ct. R. 363) (unauthorized practice of law); 8.1 (2018 Kan. S. Ct. R. 379) (false statement in connection with disciplinary matter); 8.4(c) (2018 Kan. S. Ct. R. 381) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (2018 Kan. S. Ct. R. 381) (engaging in conduct prejudicial to the administration of justice); and Kansas Supreme Court Rule 218(a) (2018 Kan. S. Ct. R. 262) (notification of clients upon suspension). Holmes concedes that the uncontested factual findings made by the panel are sufficient, standing alone, to establish each of these instances of attorney misconduct. Nonetheless, we will discuss each of the claimed exceptions in turn.

*Did Holmes have actual knowledge of his suspension on October 14, 2015?*

Holmes first asserts that "while he knew or should have known his license would be suspended for non-payment of the late fee in this matter, he nevertheless was not made aware of the order of suspension until . . . October 17th, 201[5]." During the hearing, the

disciplinary administrator introduced an October 14, 2015, email from Uhl to Jason Oldham timestamped at 10:48 a.m. The email stated Holmes had just called and was upset that he owed a late fee because he believed he mailed his registration information in plenty of time for renewal. The email also indicated Holmes said "he has not received *his* suspension notice yet." (Emphasis added.) During the hearing, Uhl testified in situations such as these, she ordinarily looks up the attorney on the computer to check his or her status. Although Uhl could not specifically recall if she told Holmes his license was suspended, she felt "very confident [she] would have," otherwise she would not have made this statement in the email.

The evidence before the panel that Uhl affirmatively told Holmes that he was suspended during the phone call on October 14 was thin. But ultimately, Holmes' admission that he was aware of the suspension on October 17 is sufficient to establish the rule violations as found by the panel. Because the specific fact in contention—the substance of the October 14 phone call—is not necessary to any of the ultimate conclusions reached by either the panel or by this court, we disregard this factual finding without deciding whether it is supported by clear and convincing evidence.

*Did Holmes enter his appearance in a Johnson County case on October 15, 2015?*

Holmes next claims the panel's finding that he appeared on October 15 in Johnson County District Court case number 15CV6206 is "completely contrary to the evidence adduced at the hearing." But the disciplinary administrator correctly points out that Holmes has confused his appearance in the Johnson County case with his nonappearance in the Leavenworth County case on the same day. The electronic docket in the Johnson County case contains the judge's bench notes, which state Holmes appeared with his client and the case was continued to November 5, 2015. And during oral arguments before this court, Holmes again argued the panel erred by finding he appeared in

Leavenworth County, though he conceded there may have been a misunderstanding regarding the county. He has confused the two hearings. The record contains clear and convincing evidence that supports the panel's finding.

*Did Holmes fail to notify his clients, opposing counsel, and courts of his suspension?*

Holmes also takes issue with the parenthetical statement made in paragraph 72 of the Amended Final Hearing Report: "(The only time the respondent notified anyone of the suspension was on October 23, 2015, when the respondent albeit untimely, orally notified Ms. Hall that his license to practice law had been suspended.)"

Holmes claimed in his testimony that he told "a variety of clients" and "a number of attorneys what had happened." He restates this assertion in his brief but fails to provide a citation to the record supporting his claim. See Supreme Court Rule 6.02(a)(4) (2018 Kan. S. Ct. R. 35) ("The facts included in the statement must be keyed to the record on appeal by volume and page number. The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal.").

To the extent Holmes is relying on his testimony to controvert the panel's finding, he is simply asking the court to reweigh his testimony against the evidence presented by the disciplinary administrator, which is beyond the scope of this court's review. See *In re Biscanin*, 305 Kan. 1212, 1220, 390 P.3d 886 (2017). Regardless, Holmes concedes he failed to notify every court, client, and opposing counsel. He merely quibbles with the panel's characterization that he only notified one person. Thus he does not materially controvert the factual finding. See Supreme Court Rule 218(a) (2018 Kan. S. Ct. R. 262-63) (requiring a suspended or disbarred attorney to notify "each" client, "all" opposing counsel, and "all" courts where the attorney is counsel of record of the suspension or disbarment in writing).

*Did Holmes engage in the unauthorized practice of law on October 23, 2015?*

Holmes next claims he did not engage in the unauthorized practice of law when speaking with Ms. Hall on October 23, 2015. Ms. Hall stated Holmes approached her in the courtroom that day and asked to discuss a case in the hallway. Once outside, she claimed Holmes asked her if they could continue the eviction case and agree that his clients would move out of the duplex on Monday. Ms. Hall told him she would have to discuss it with her client. Ms. Hall told her client that Holmes did not have a license to practice law. Thereafter, Ms. Hall secured a default judgment for her client.

Later that day, Holmes appeared at Ms. Hall's office to deliver a file unrelated to the eviction case. Ms. Hall claimed Holmes asked about the status of the eviction case, and she responded that she could not talk about it and that he needed to leave. Holmes then tried to continue to discuss the case, and she reiterated that he needed to leave, so he left.

On cross-examination, Holmes asked Ms. Hall about their conversation outside the courtroom:

> "[I]n fact, I didn't attempt to negotiate anything with you, did I? I simply advised you I had been contacted by [my clients], they were in the process of moving out. It was a courtesy to you, I was simply letting you know that they would be out, as I understood, that following Monday. Does that sound correct?"

Ms. Hall answered: "No, it does not sound correct."

The record contains clear and convincing evidence that supports the panel's finding that Holmes engaged in the unauthorized practice of law during his interaction

with Ms. Hall on October 23 by engaging in settlement negotiations on behalf of his clients while his license was suspended. See *In re O'Leary*, 303 Kan. 456, 460, 462, 362 P.3d 1092 (2015) (attorney who engaged in settlement negotiations on behalf of client after the attorney's license was suspended violated KRPC 5.5[a]).

*Did Holmes make false statements and misrepresentations during the disciplinary process?*

Lastly, Holmes controverts the extent to which he submitted false or misleading statements during the disciplinary process. With one notable exception, he concedes he made the alleged statements and that those statements were either not true or were misleading, but he offers mitigating circumstances to explain those statements. The thrust of his argument appears to be that the misrepresentations arose innocently out of his poor memory rather than a knowing intent to deceive the panel. He attempted to explain his reasons as follows:

"I—in hindsight, hindsight is 20/20, there's a lot of things I could have done. But when you're in the moment, you act, sometimes in desperation, sometimes out of panic. You don't set out to do anything wrong. You don't set out intentionally—this wasn't like I was going in to rob a bank, any plan like that. This is something that came as a bit of a surprise, and I tried to protect my client. I was acting in their behalf. At least that was my intention. This was not something I was doing for myself.

"I was dishonest with regards to acting on behalf of my client where I knew that the license had been suspended, but the prior week it was more negligent. This wasn't something that I actually knew. It's something that I should have known, perhaps should have made myself aware of, should have thought through. Again, hindsight is 20/20, and you kick yourself every time you think of what should have happened.

"I didn't appreciate the effect that it would have [on] my clients. I think, perhaps, the full extent not even until today. 'Um, I don't know how much more my clients would have done, or could have done, had they known any sooner, but I didn't tell them early enough. And we're talking about days here. This is not something that was a long period of time. From beginning to end, we're talking about a couple weeks. And so that period, yeah, I didn't act as I should have. And there are things I could have done proactively weeks earlier, as I've indicated.

"Do I acknowledge, absolutely. ***Did I acknowledge everything at the time that I sent in some self-reports, probably not***. Again, it was my way of dealing with it. I didn't—I simply couldn't do everything, say everything. 'Um, it came out in fits and spurts. 'Um, it's still coming out. I didn't make what I perceived to be a material misrepresentation in any of those reports. There's no flat out lie anywhere. Did I under report? I did. And I think that was, again, not because I was out to do that, but because I simply had difficulty emotionally handling it." (Emphasis added.)

Before this court, Holmes admitted that his October 23, 2015, self-report letter violated KRPC 8.1. Moreover, regardless of Holmes' seemingly innocent explanations for other false or misleading statements, with only one exception discussed below, he does not contend his statements were actually true. Holmes admitted misleading statements during the disciplinary process are sufficient in themselves to support the panel's finding of a KRPC 8.1 violation.

The only specific claim Holmes made that he continues to claim was actually true is his insistence that Uhl did not actually tell him he was suspended during the phone conversation on October 14. The disciplinary administrator alleged and the panel found this to be false. As already discussed above, we have noted that the record evidence concerning what was actually said during that phone call is thin. Uhl testified she did not recall the specific nature of the conversation. She could only testify to her ordinary practice on such calls. Because this specific factual finding is not necessary to support any of the rules violations found by the panel, we have disregarded it. We do take this

41

opportunity to simply note that merely mounting a nonfrivolous defense against allegations of misconduct during an attorney discipline proceeding is insufficient, standing alone, to establish an additional rule violation, even if that defense is ultimately unsuccessful.

*Mitigating Circumstances*

"Mitigating or aggravating circumstances which affect the nature or degree of discipline to be imposed or recommended in a matter shall be fully set forth in the panel report." Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 252). In arriving at the appropriate discipline, the panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each. *Hawkins*, 304 Kan. at 142. On appeal, this court determines whether it agrees with the panel's findings regarding aggravating and mitigating circumstances. *In re Kline*, 298 Kan. 96, 220-21, 311 P.3d 321 (2013).

Although the panel found no mitigating circumstances present, Holmes argues there are four: (1) his actions on October 23, 2015, were necessary to save his clients from eviction; (2) Holmes notified the courts and Ms. Hall of his suspension; (3) he "immediately undertook action to remedy" his suspension when he received notice of the order of suspension; and (4) he expressed remorse over his conduct.

The unauthorized practice of law is not something this court takes lightly. And we remain unconvinced that Holmes comprehends the seriousness of his misconduct. Far from "helping" his clients by engaging in the unauthorized practice of law, Holmes' conduct hurt them if for no other reason than it hindered them from obtaining licensed counsel. Half measures to notify some people of a suspension while continuing to

practice law without a license are not mitigating factors, but in fact demonstrate ongoing dishonesty and conduct that reflects adversely on an attorney's fitness to continue practicing law.

As for Holmes' remorse, we are always inclined to give attorneys who seek second chances every benefit of the doubt. This is in large part why the court maintains a robust program for probation for disciplined attorneys. But Holmes has failed to fully avail himself of this opportunity. At the hearing, Holmes called Neal Fowles—an attorney from whom Holmes was renting office space—to testify. Fowles briefly testified that he would be willing to supervise Holmes during a period of probation. On cross-examination, however, it was revealed that Fowles was only generally aware of the facts of the disciplinary case, and he had not read the terms of the proposed probation plan.

During the hearing before this court, Holmes admitted that although he had provided the panel with a plan of probation, he had not fully implemented it. Our rules provide that once a respondent provides the panel and disciplinary administrator a proposed plan of probation, he or she "shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan." Supreme Court Rule 211(g)(2) (2018 Kan. S. Ct. R. 253). In addition, Holmes did not file with this court an affidavit assuring us that he was fully complying with the terms of his probation plan. See Supreme Court Rule 211(g)(5). We do not find probation appropriate under these circumstances.

*Appropriate Discipline*

The hearing panel unanimously recommended that Holmes be suspended for one year. The disciplinary administrator recommended to the panel—and maintains before us now—that Holmes should be suspended for six months. Holmes believes suspension is too harsh and requests published censure or suspension with supervised probation.

43

"This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz,* 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The court bases its disciplinary decision on the facts and circumstances of the violations and the aggravating and mitigating circumstances present. *In re Johanning,* 292 Kan. 477, 490, 254 P.3d 545 (2011). And although not mandated by our rules, this court and disciplinary panels '[h]istorically' turn to the ABA Standards for Imposing Lawyer Sanctions to guide the discipline discussion. See ABA Compendium of Professional Responsibility Rules and Standards (2012); see also *In re Woodring,* 289 Kan. 173, 180, 186, 210 P.3d 120 (2009) (discussing and applying ABA Standards); *In re Rumsey,* 276 Kan. 65, 78-79, 71 P.3d 1150 (2003) (citing and discussing ABA Standards).

"Under the ABA Standards, four factors are considered in assessing punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the misconduct; and (4) the existence of aggravating and mitigating circumstances. See *Rumsey,* 276 Kan. at 78 (listing the four components of the ABA Standards' framework); ABA Standard § 3.0." *Hawkins*, 304 Kan. at 140.

The hearing panel found that the following aggravating circumstances were present: (1) prior disciplinary offenses; (2) dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; and (6) substantial experience in the practice of law.

During the hearing, Holmes was asked to describe his prior disciplinary offenses in Idaho, and he explained:

"Well, we got to go back to the 1990s. In addition to my practice of law, I did have a side business, which I don't have anymore, and I wouldn't have anymore, 'um, and it was—basically, it was a portrait photographer. I had a very attractive client who had indicated to me that she was—she had—I think she had been a model, or mom had been a

44

model, or something like that. Came out I was—I did the photography, and she approached me about taking pictures with her children and—that would be nude. 'Um, I agreed to that. In fact, eagerly. 'Um, and, you know, in hindsight, I think that this was probably something that was maybe in her head in a theoretical, but I pressed, you want to do this, you want to do this, you want to do this, and we did. It was a horrible incident. The kids were—she had twin boys that were infants and they were, 'um, not wanting any of this to happen. And, 'um, I was still interested in—in doing this, and I took pictures of her, as well as tried to get pictures with her and the boys.

"'Um, at first this was not something that caused a problem with her, at least that's what I understood. I continued to represent her for a number of months thereafter. And then her case went south, largely because of a recommendation of a child custody investigation that found that she would be—that the father, the husband, should be primarily—the primary caregiver for the children, and I think that that led her to blame me. It came out that this had happened. I had admitted it. I had understood—at least understood in hindsight, this is something that was consensual, but came to realize, no, I was probably pushing her to do this. 'Um, and I admitted it and it resulted in a period of suspension."

Holmes also described a situation in which he prepared a document for a client that was never filed, which ultimately barred a cause of action.

In arguing suspension is not warranted, Holmes cites *In re Sutton*, 298 Kan. 793, 316 P.3d 741 (2014). In that case, the panel found Sutton engaged in the unauthorized practice of law in several cases, including one case after Sutton had received notice that the review committee had found probable cause that he had practiced law without a license. After adopting the panel's findings, this court suspended Sutton for six months. 298 Kan. at 800-01. Holmes believes his conduct was not as egregious as Suttons', so suspension is not warranted.

"This court has taken the position that, while prior cases may have some bearing on the sanctions that the court elects to impose, those prior cases must give way to consideration

45

of the unique circumstances that each individual case presents. This court concerns itself less with the sanctions that were appropriate in other cases and more with which discipline is appropriate under the facts of the case before us. [Citations omitted.]" *In re Colvin*, 300 Kan. 864, 874, 336 P.3d 823 (2014).

Considering all the facts and circumstances of this case, and in deference to the panel that heard the evidence before it, we adopt the panel's recommendation and impose a one-year suspension from the practice of law. A minority of the court would adopt the disciplinary administrator's six-month suspension recommendation.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Curtis N. Holmes be and he is hereby disciplined by suspension for a period of one year in accordance with Supreme Court Rule 203(a)(2) (2018 Kan. S. Ct. R. 234) effective upon the date of filing of this decision; that he not be granted probation; and that he undergo a reinstatement hearing pursuant to Supreme Court Rule 219(d) (2018 Kan. S. Ct. R. 264).

IT IS FURTHER ORDERED that respondent comply with Supreme Court Rule 218 (2018 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this decision be published in the official Kansas Reports.

NUSS, C.J., and BEIER, J., not participating.

G. GORDON ATCHESON, J., and MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Judge Atcheson, of the Kansas Court of Appeals, and Senior Judge Malone were appointed to hear case No. 118,310 vice Chief Justice Nuss and Justice Beier respectively, under the authority vested in the Supreme Court by K.S.A. 20-3002(c) and by K.S.A. 20-2616.