IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,036

In the Matter of MARK D. MURPHY,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 16, 2020. Two-year suspension. Respondent may apply for probation after one year.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the brief for petitioner.

*Daniel F. Church,* of Morrow Willnauer Church, LLC, of Kansas City, Missouri, argued the cause and was on the briefs for respondent. *Mark D. Murphy*, respondent, argued the cause pro se.

PER CURIAM:  This is a contested attorney discipline proceeding against Mark D. Murphy, of Overland Park, Kansas. He was admitted to practice law in the state of Kansas in 1987. A panel of the Kansas Board for Discipline of Attorneys made lengthy findings of fact and concluded Murphy violated the Kansas Rules of Professional Conduct (KRPC). The violations include representing both parties in a business transaction that was not disclosed to a federal bankruptcy court which had jurisdiction and related matters.

In December 2016, the Disciplinary Administrator's office filed a formal complaint alleging violations of the KRPC against Murphy. Almost two years later, and after several continuances and a remand on behalf of the Disciplinary Administrator's

1

office, an amended formal complaint was filed in January 2019. Murphy's answer to the amended formal complaint was filed in February 2019.

A panel of the Kansas Board for Discipline of Attorneys began a hearing on March 5, 2019, but was unable to finish the presentation of evidence on that day so the hearing was continued to April 10, 2019. The hearing panel determined respondent violated KRPC 1.1 (2019 Kan. S. Ct. R. 295) (competence), 1.2(c) (2003 Kan. Ct. R. Annot. 332) (scope of representation), 1.7 (2003 Kan. Ct. R. Annot. 372) (conflict of interest), 2.1 (2019 Kan. S. Ct. R. 345) (independent judgment), and 8.4(d) (2019 Kan. S. Ct. R. 387) (conduct prejudicial to the administration of justice).

The Disciplinary Administrator's office recommended disbarment. Counsel for the respondent recommended reprimand. The hearing panel unanimously recommended one year's suspension.

The respondent filed exceptions to the panel's final hearing report, although he concedes several KRPC violations, albeit with explanations in mitigation. Before this court, the Disciplinary Administrator's office endorses the panel's findings and continues to recommend disbarment. Respondent recommends reprimand with a plan of probation. We quote the report's pertinent parts below.

"*Procedural history*

. . . .

"10.     On February 25, 2019, the respondent filed an untimely answer to the amended formal complaint.

"11.  On March 4, 2019, at 4:07 p.m., on the eve of the hearing, the respondent filed two motions. The respondent filed a motion to strike paragraph 22 of the formal complaint and a motion to prohibit a collateral attack. The hearing panel denied the respondent's motions.

. . . .

"*Findings of Fact*

"16.  The hearing panel finds the following facts, by clear and convincing evidence:

"17.  Mark D. Murphy (hereinafter 'the respondent') is an attorney at law, Kansas attorney registration number 13129. His last registration address with the clerk of the appellate courts of Kansas is 6640 West 143rd Street, Suite 250, Overland Park, Kansas 66223. The Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas on April 15, 1987.

"18.  A.H. operated a limousine service. A.H.'s company was known by a variety of names. A.H. and his wife, I.H., incorporated the limousine service under two of the names. A.H. did not follow corporate formalities and in 2003, the corporations' charters were forfeited. During their existence, the corporations did not issue any stock.

"19.  In April, 2003, A.H. listed his limousine business for sale with a broker. The initial asking price was $800,000. Later, A.H. reduced the asking price to $695,000. The broker was unable to sell the limousine business.

"20.  A.H. was interested in building a soccer complex in the Kansas City area. To that end, A.H. and B.S. formed a company to do so, called IFC. A.H. and B.S. named themselves co-presidents. To raise capital to fund the soccer complex, A.H. and B.S. entered into an advisory fee agreement with B.C., a firm which raises capital for other companies.

3

"21.     S.L. was the chief operating officer and 50% owner of B.C. S.L. was also the respondent's neighbor. Prior to 2004, the respondent provided legal services to S.L. and B.C. From time to time, S.L. referred other clients to the respondent.

"22.     S.L. referred IFC to the respondent. As a result, the respondent became counsel for IFC. The respondent drafted IFC's shareholder agreement to memorialize the relationship between its partners.

"23.     On February 3, 2004, A.H. and his wife filed for the protections of chapter seven of the bankruptcy code. On a bankruptcy schedule, A.H. and his wife listed the limousine business as an asset, but valued it at $0. Regardless of the value, the limousine business was part of the bankruptcy estate.

"24.     A.H. and S.L. discussed the sale of the limousine business as a means to raise capital to fund IFC. S.L., through B.C., agreed to assist A.H. in selling the limousine business.

"25.     A.H.'s son and A.M.'s son played soccer together in the Kansas City area. Following a soccer practice, on March 26, 2004, A.H. and A.M. discussed A.M. purchasing A.H.'s limousine business. During their discussions regarding the possible transaction, A.H. indicated that he would be willing to sell the business for $550,000. A.H. asserted that the business netted $12,000 - $15,000 monthly. A.H., however, did not inform A.M. that he filed a chapter seven bankruptcy case nearly two months earlier.

"26.     On May 5, 2004, S.L. contacted the respondent and requested the respondent assist A.H. and A.M. with the business transaction.

"27.     On May 17, 2004, the respondent, S.L., A.H., and A.M. met. Thereafter, the respondent drafted an engagement letter addressed to A.H. (personally and as president of the limousine business), A.M., and his wife, D.M. The letter provided:

4

'This letter is to confirm our agreement with regard to our representation upon the following terms:

'You hereby employ The Murphy Law Firm, P.A. to prepare all necessary documentation and advise both [A.H.], as the seller, and [A.M.], as the purchasers, of all of the capital stock of Kansas Express International, Inc., which is owned by [A.H.]. I have disclosed the potential conflicts in doing so; however, after acknowledging such conflicts you all agree to waive any such conflict and retain us nonetheless pursuant to the terms of this letter and the enclosed Standard Terms of Engagement. Should a conflict arise which cannot be resolved, we will withdraw from this transaction with regard to all parties in this matter, and you should then retain your own legal counsel to advise you.

'The legal fees and expenses will be paid by you, jointly and severally. . . .'

The respondent, A.H. (personally and as president of the limousine business), A.M., and D.M. signed the engagement letter.

"28.    The respondent has repeatedly asserted that he represented only the transaction, he did not provide legal advice to either party, and he acted as a mere scrivener. In an affidavit, the respondent swore that the engagement letter 'expressly provided that [he] would provide no legal advice to [A.M.] and [A.H.].' In a deposition, the respondent testified under oath that he 'didn't give legal advice to either side.'

"29.    Despite the respondent's statements to the contrary, the engagement letter does not expressly provide that the respondent 'would provide no legal advice to either party;' it expressly provided the opposite ('You hereby employ The Murphy Law Firm, P.A. to prepare all necessary documentation and advise both [A.H.], as the seller, and [A.M.], as the purchasers . . .')

5

"30. The respondent admitted this during a deposition. The respondent testified under oath, '[a]ctually, the engagement letter shows that they are both employing me to prepare the documentation and advise them both of the transfer of that business.' In the same deposition, the respondent later testified:

'The intent was to represent the seller and the buyer and basically represent the transaction, and, again, my role was basically as a scribe to do that without, again, giving any kind of, you know, standard legal advice to either side about whether it was a good deal, bad deal, terms, negotiations.'

When asked whether he explained what a stock purchase was to A.H. and A.M., the respondent stated that he 'probably did explain the differences between an asset purchase and a stock purchase transaction to them.' Finally, the respondent admitted that he 'probably made some general statements . . . in the presence of everyone [about due diligence].'

"31. The bankruptcy court later concluded that the respondent's assertion that he was a mere scrivener came 'close to being "so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe [it]."'

"32. In the engagement letter, the respondent included the following: 'I have disclosed all the potential conflicts . . . , after acknowledging such conflicts you all agree to waive any such conflict and retain us nonetheless . . .' While the testimony of A.M. and the respondent are not in direct conflict on this subject, after observing all the witnesses testify and after reviewing all the evidence, the hearing panel accepts A.M.'s testimony and where the respondent's testimony is inconsistent with A.M.'s testimony on this subject, the hearing panel rejects the respondent's testimony.

"33. A.M. testified that the respondent did not explain any potential conflict. A.M. testified that the respondent spent seven to 20 seconds on that provision of the engagement letter and the gist of the conversation was that if A.H. and A.M. reached an

6

impasse in the negotiations, they would each need to hire their own lawyer to complete the transaction.

"34. On May 18, 2004, the bankruptcy court entered a discharge in A.H. and I.H.'s bankruptcy case.

"35. The respondent drafted a stock purchase agreement which provided that A.M. and D.M. would purchase the capital stock and assets of the limousine business for $550,000. The stock and assets of the corporation which was purportedly sold to A.M. under the stock purchase agreement were the property of the bankruptcy trustee.

"36. The stock purchase agreement provided that A.H. was the owner of 'all the issued and outstanding shares of [the limousine business].' The agreement, however, did not mention the possibility that A.H. used multiple names in operating the limousine business. Further, no stock was ever issued by any of A.H.'s corporations and by the time the stock purchase agreement was drafted, A.H. forfeited the corporations by failing to comply with the required formalities. During his second deposition, the respondent testified that he would have checked with the Kansas Secretary of State to see the status of the corporation. The respondent then contradicted himself and testified:

'. . . And I think looking back, it might have been forfeited at the time for an administrative failure to file an annual report or something. But . . . we would be selling them the stock of that company that was owned by [A.H.].'

The respondent did not acknowledge that the limousine business never issued any stock.

"37. Under the stock purchase agreement, A.M. and D.M. were required to make a down payment of $105,000 and were also required to pay $170,000 at the time of closing, scheduled for July 1, 2004. At closing, A.M. and D.M. were to execute a promissory note for the remaining $275,000. The respondent drafted a pledge agreement which provided that A.M. and D.M. would secure the promissory note with the stock in

the limousine business. The parties executed the stock purchase agreement on May 28, 2004.

"38.     The stock purchase agreement described 16 documents and indicated the documents were attached to the agreement. The 16 documents were not attached to the agreement. It appears that none of the 16 documents were ever prepared and presented to A.H., A.M., and D.M.

"39.     It is clear that at the time the stock purchase agreement was executed, A.M. and D.M. were buying A.H.'s limousine business and not his promise to work for them after the business was transferred to them.

"40.     By May 28, 2004, A.M. and D.M. paid A.H. $105,000 as agreed. Then, during the month of June, 2004, A.M. and D.M. paid A.H. another $24,420. All totaled by the end of June, A.M. paid A.H. $129,420 of the agreed $550,000 purchase price.

"41.     After signing the stock purchase agreement, A.M. formed a corporation for his limousine business.

"42.     On June 29, 2004, A.M. went to A.H.'s office after hours to review information related to the limousine business. At that time, A.M. came across an April 15, 2004, a cell phone invoice which referenced the chapter seven bankruptcy petition. A.M. was unaware of the bankruptcy until that time. As a result, A.M. hired a private investigator to investigate details about the bankruptcy. The private investigator found detailed information regarding the bankruptcy, including Schedule B of the bankruptcy filings where A.H. listed the limousine business at zero value. On July 2, 2004, A.M. informed the respondent that A.H. filed for bankruptcy.

"43.     On July 2, 2004, the respondent obtained and reviewed copies of the bankruptcy filings. When the respondent reviewed A.H.'s bankruptcy filings, he noticed that A.H. attributed zero value to the limousine business on Schedule B of the bankruptcy filings. That day, the respondent met with A.H., A.M., and D.M. The respondent recommended rescheduling the closing date in order to research the impact the

8

bankruptcy action had on the stock purchase agreement. The parties mutually agreed to reschedule the closing based on the respondent's recommendation.

"44. After A.M. told the respondent about A.H.'s bankruptcy, the respondent was on notice that his two clients were in direct conflict with one another. The respondent did not withdraw from the representation; rather, the respondent negotiated a different deal between the parties. Further, the respondent did not seek and obtain his clients' consent to continue the joint representation after consultation regarding the conflict.

"45. On this subject, the bankruptcy court found that the respondent:

'suggested that the problems posed by [A.H.]'s bankruptcy could be avoided if the transaction was recharacterized as a sale of services instead of a sale of the business or a sale of assets. To that end he prepared a [second agreement] (which was backdated to May 28 even though it was signed on or about July 6) wherein [A.H.] agreed to provide his services to [A.M.]'s limousine company for one year in exchange for $300,000 plus incentive payments based on the performance of [A.M.]'s new limousine company. Like the Stock Purchase Agreement, the [second agreement] included a covenant not to compete; unlike the Stock Purchase Agreement, the [second agreement] specified that $50,000 of the sale price was attributable to the covenant. Despite purporting to be a services agreement, the [second agreement] contains many provisions one would expect to see only in a contract for the sale of a business or its assets.'

In the second agreement, A.M.'s corporation replaced A.M. and D.M. as the party named on their side of the transaction. The purchase price was reduced to $300,000 because A.M. could not verify the net income A.H. indicated the limousine business generated. The next day, A.H. and A.M. signed the second agreement and A.M. paid A.H. $171,000, the balance of the purchase price under the second agreement.

9

"46.     Toward the end of July, 2004, A.M. discovered that the operations and finances of the business did not live up to A.H.'s representations. A.M. returned the office keys, abandoned the business, and attempted to rescind the transaction. A.H., however, refused to return any of A.M.'s money. A.H. apparently retained whatever tangible assets had been purportedly sold to A.M. and continued to operate the limousine business.

"47.     A.H. met with the respondent to discuss his options. The respondent suggested that A.H. consult with legal counsel and the respondent referred A.H. to Cynthia (Grimes) Norton. (Since that time, Ms. Norton took the federal bankruptcy bench.) In late July, 2004, the respondent called Ms. Norton and let her know that A.H. would be calling for advice about a transaction involving a limousine deal in connection with his chapter seven bankruptcy case. Specifically, the respondent told Ms. Norton that the transaction had been structured as a sale of assets but was going to be restructured as something else because the seller was in bankruptcy. Ms. Norton told the respondent that she did not think that restructuring would work but she would talk with A.H.

"48.     That same day, A.H. called Ms. Norton on her cell phone and discussed the situation with A.M. While Ms. Norton had A.H. on the phone, Ms. Norton pulled up A.H.'s bankruptcy case. She noted that an adversary proceeding was pending. Ms. Norton told A.H. that he needed to inform his attorney of the situation so that the trustee could be informed. Ms. Norton did not undertake to represent A.H.

"49.     On July 26, 2004, A.H. met with his bankruptcy attorney, told his attorney about the second agreement, and provided him with a copy of the second agreement. A.H. did not disclose the existence of the stock purchase agreement to his attorney.

"50.     That same day, A.H.'s attorney wrote to the bankruptcy trustee and provided him with a copy of the second agreement.

'Enclosed please find a copy of the Intrust Bank statement requested by your office in the [A.H.] case, which was provided to me today, July 26, 2004. If you will determine the balance due to the bankruptcy estate, I

10

believe that [A.H. and his wife] will turn over those funds in a timely manner.

'Additionally, I have enclosed a copy of an agreement entered into post-petition by [A.H.]. [A.H.] is concerned that his failure to advise you of this agreement is a violation of his duties under the bankruptcy law. My understanding of the agreement is that it is an agreement not to compete and to provide consultation to [A.M.] and Kansas City Limousine & Budget Limousine. As such, I do not believe that any income derived from this agreement is property of the bankruptcy estate.

'[A.H. and his wife] are very eager to finalize their bankruptcy case. I note that discharge was entered in the case on May 18, 2004. Please advise.'

"51.    The bankruptcy trustee reviewed the second agreement and concluded that despite the large amount of money being paid to A.H., the payment appeared to be for services and did not constitute property of the estate.

"52.    About that same time A.M. complained to the Johnson County District Attorney about what he believed to be A.H.'s fraudulent conduct. An investigation was initiated and in early 2005, an investigator met with the bankruptcy trustee. The investigator provided the bankruptcy trustee with a copy of the stock purchase agreement. This was the first time the bankruptcy trustee saw the stock purchase agreement.

"53.    In January, 2005, the respondent assisted A.H. with selling the limousine business again.

"54.    On April 28, 2005, Christopher Redmond wrote to the respondent regarding the sale of the limousine business from A.H. to A.M. In the letter, Mr. Redmond asserted that A.H. converted bankruptcy estate property by selling the business to A.M. Mr. Redmond characterized the second agreement as 'an attempt to defraud.'

11

"55. On December 7, 2005, Mr. Redmond filed an adversary proceeding. Ultimately, A.H., A.M., D.M., A.M.'s corporation, the respondent, and other individuals and entities were joined as defendants.

"56. In the adversary proceeding, the court concluded that the entire $300,420 paid by A.M. was for the business and became bankruptcy estate property. Specifically, the court found that the $129,420 was paid pursuant to the stock purchase agreement in contemplation of A.M.'s receipt of the company's assets. The court also found that the parties' intent was not changed by the execution of the second agreement. The court characterized the second agreement as a 'sham.' The court also stated, '[t]he Agreement was a thinly disguised subterfuge designed to secure the transaction's true nature; the artifice was specifically designed to skirt the bankruptcy laws.' The court also found that the $171,000 A.M. paid A.H. at closing was likewise property of the bankruptcy estate. Ultimately, the court revoked A.H.'s discharge in bankruptcy.

"57. After lengthy negotiations, on March 7, 2007, Mr. Redmond, A.M., D.M. and A.M.'s corporation entered into a settlement agreement.

"58. Then, on July 8, 2014, Mr. Redmond and the respondent entered into a settlement agreement. To settle the matter, the respondent paid Mr. Redmond $250,000.

"59. A.M. and D.M. filed suit against the respondent and A.H. Included in the allegations in the petition was a claim for legal malpractice against the respondent. In 2018, the case went to trial. The jury found the respondent to be 20% at fault, A.M. and D.M. to be 44% at fault, and A.H. to be 36% at fault.

"60. On February 25, 2016, A.M. filed a complaint with the disciplinary administrator regarding the respondent. On April 11, 2016, the respondent provided a written response to A.M.'s complaint. In this final hearing report, the hearing panel has referenced relevant items of evidence from the adversary proceeding as well as the lawsuit filed by A.M. and D.M. For purposes of the disciplinary proceeding, a detailed recitation of the history of the two lawsuits is not relevant to the allegations in the formal complaint filed in this case.

12

*"Conclusions of Law*

"61.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1 (competence), 1.2(c) (scope of representation), 1.7 (conflict of interest), 2.1 (exercise independent judgment), and 8.4(d) (conduct prejudicial to the administration of justice), as detailed below.

"62.    The hearing panel notes that KRPC 1.2 (scope of representation) and KRPC 1.7 (conflict of interest) have been amended since the respondent engaged in the misconduct. The hearing panel is relying on the rules that were in effect at the time the respondent engaged in the misconduct.

"KRPC 1.1

"63.    Lawyers must provide competent representation to their clients. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The respondent failed to provide A.M. with competent representation. In the engagement letter, the respondent agreed to advise A.M. (as well as A.H.) regarding the transaction. Despite his agreement to advise A.M., the respondent failed to competently advise A.M. regarding the transaction. The respondent was unaware that A.H. filed bankruptcy and listed the limousine business as an asset with a $0 value. Further, at the hearing on the formal complaint, the respondent admitted that he would not counsel a client to enter into the agreements involved in this matter because there are no barriers to enter the limousine service market. Moreover, the respondent admitted that he was not versed in bankruptcy. Clearly, the respondent failed to give A.M. (as well as A.H.) competent counsel regarding the transaction particularly in light of the bankruptcy case. The hearing panel concludes that the respondent failed to provide competent representation to A.M., in violation of KRPC 1.1.

13

## "KRPC 1.2(c)

"64. In 2004, KRPC 1.2(c) remained in its original form and provided that '[a] lawyer may limit the objectives of the representation if the client consents after consultation.' In this case, the respondent did not obtain A.M.'s consent to limiting his representation. In fact, the engagement letter provided to the contrary. The engagement letter clearly stated that the respondent would 'advise both [A.H.], as the seller, and [D.M. and A.M.], as the purchasers'. A.M. relied on the language in the engagement letter that he would advise A.M. regarding the transaction. A.M. retained the respondent to prepare all the necessary documents and to advise him on the deal. Nowhere in the respondent's engagement letter does the respondent indicate that he is limiting his representation or serving as a 'mere scrivener.' The respondent admitted that he advised the parties on matters during the representation. Upon review of this same issue, the bankruptcy court concluded that the respondent's assertion that he was a mere scrivener came 'close to being "so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe [it]."' Accordingly, the hearing panel concludes that the respondent violated KRPC 1.2(c), as it existed in 2004.

## "KRPC 1.7

"65. In 2004, KRPC 1.7 provided:

'(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

'(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to

14

another client or to a third person, or by the lawyer's own interests, unless:

> (1) the lawyer reasonably believes the representation will not be adversely affected; and

> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Consultation was and still is defined in the rules as 'communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.'

"66.   In the engagement letter, the respondent purported to comply with KRPC 1.7. The respondent stated that he had disclosed 'the potential conflicts . . . [and] after acknowledging such conflicts you all agree to waive any such conflict and retain us nonetheless.' Based on the record before it, the hearing panel concludes that the provision in the engagement letter does not satisfy the consent after consultation requirement of KRPC 1.7.

"67.   First, as of July 1, 2014, when the respondent learned of A.H.'s bankruptcy, the respondent was placed on actual notice of a direct conflict of interest between his two clients. The respondent was prohibited from continuing to represent both clients, unless each client consented after consultation. The respondent did not withdraw from the representation nor did he obtain each client's consent after consultation. Rather, as found by the bankruptcy court, the respondent suggested to A.M. and A.H. that he draft a second agreement to attempt to work around the bankruptcy. As such, the hearing panel concludes that the respondent violated KRPC 1.7(a).

"68.   Second, the respondent never disclosed to A.M. his previous personal and professional relationship with S.L. and his previous professional relationship with

15

IFC. It is clear that the respondent's previous personal and professional relationship with S.L. and his previous professional relationship with IFC, may have materially limited the respondent's representation of A.M. in this case. The respondent did not explain the conflict to A.M. nor did he seek or obtain A.M.'s consent to this conflict. The hearing panel concludes that the respondent's failure in this regard amounts to a violation of KRPC 1.7(b).

"KRPC 2.1

"69.     Lawyers must exercise independent professional judgment and render candid advice. KRPC 2.1. In this case, the respondent failed to exercise independent professional judgment and render candid advice to A.M. when he failed to advise A.M. of the potential and actual problems with entering the agreements. The respondent's judgment was influenced by the economic factors relevant to the entire situation, particularly so given his previous relationships with S.L. and IFC. The respondent's failure to exercise independent professional judgment and candid advice is particularly egregious after the respondent learned of A.H.'s bankruptcy. Moreover, the respondent testified that he would not have advised 'an independent' client to proceed as A.M. proceeded because there are no barriers to enter the limousine service business. As A.M.'s attorney, under KRPC 2.1, the respondent owed him the duty to exercise independent judgment and render candid advice. The hearing panel concludes that the respondent failed to do so in violation of KRPC 2.1.

"KRPC 8.4(d)

"70.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he drafted the second agreement in an attempt to circumvent the bankruptcy case. The respondent knew that the assets of the limousine service, regardless of their value, were part of the bankruptcy estate. The hearing panel agrees with the bankruptcy court that attempting to restructure the deal was 'a thinly disguised subterfuge designed to secure the transactions true nature;

16

the artifice was specifically designed to skirt the bankruptcy laws.' The respondent's attempt to skirt the bankruptcy laws violated KRPC 8.4(d).

"71.    In 1982, the Kansas Supreme Court considered an attorney disciplinary case that presented a similar factual scenario. The respondent in *State v. Callahan*, 232 Kan. 136 (1982), represented both parties, L.L. and R.F., in a land transaction. L.L. had been the respondent's long time client and was also the respondent's business partner. L.L. suggested to R.F. that the respondent handle the transaction for both of them. R.F. agreed and the respondent drafted two contracts for L.L. and R.F. Relying on Mr. Callahan's advice, R.F. executed the contracts. The terms were favorable to L.L. and ultimately, L.L. did not pay the balance on the land. R.F. believed that the respondent had secured her interest in the land by recording a lien on her behalf. Unbeknownst to her, the respondent did not record a lien and R.F. did not have a secured interest in the property. In the disciplinary proceeding, the respondent argued that he did not represent R.F., but rather he was a 'mere scrivener.'

"72.    The Court summarized the case as follows:

'. . . [R.F. and her family] relied upon respondent to represent them as their lawyer rather than as a mere scrivener. He failed to disclose his close business ties with [L.L.] and to exercise his independent professional judgment [on] behalf of . . . [R.F. and her family] in preparing the contracts for the sale. His delay in apprising [R.F. and her family] that they had no foreclosable interest was less than an honest representation.'

"73.    *Callahan* is remarkably similar to the case at hand. Callahan and the respondent both failed to exercise independent professional judgment on behalf of their clients in rendering advice and drafting the agreements. Callahan and the respondent drafted documents which were unfavorable to one of their clients in favor of their other client. The injured parties in both cases, R.F. and A.M., relied to their detriment on their attorneys to provide independent professional judgment and candid advice regarding the transaction. Callahan argued, as the respondent does here, that he was a mere scrivener.

17

Callahan had an existing relationship with the other party who stood to gain if the transaction was completed. Here the respondent had an existing relationship with S.L. and IFC who both stood to benefit if the agreements were entered. Callahan delayed informing R.F. that she did not have a secured interest in the property. Here, the respondent never informed A.M. of the loss he would suffer because the limousine business was part of the bankruptcy estate.

"74.    The *Callahan* case was decided under the old disciplinary rules. The Court in that case, found that Mr. Callahan violated DR 1-102(A)(4) (conduct that involves dishonesty, fraud, deceit, or misrepresentation), DR 5-105(B) and (C) (conflict of interest), and DR 6-101(A)(3) (neglecting a legal matter). The Court indefinitely suspended Mr. Callahan's license to practice law.

"75.    Because of the factual similarities between *Callahan* and the present case, the hearing panel finds the Court's consideration of *Callahan* to be persuasive.

*"American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"76.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"77.    *Duty Violated*. The respondent violated his duties to his client to provide competent representation and to refrain from engaging in conflicts of interest. The respondent likewise violated his duty to the legal profession to refrain from engaging in activity that is prejudicial to the administration of justice.

"78.    *Mental State*. The respondent knowingly and intentionally violated his duties.

18

"79.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual, serious injury. As a result of the respondent's failure to exercise independent professional judgment and render candid advice, A.M. paid A.H. $300,420 for a business which A.H. did not own and which A.H. had previously valued at $0. Additionally, as a result of the respondent's misconduct and in an attempt to recover some of the $300,420 he lost, A.M. filed suit. The litigation lasted nearly 15 years.

"Aggravating and Mitigating Factors

"80.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"a.    *Prior Disciplinary Offenses*. While the respondent had not yet been disciplined at the time the misconduct occurred in this case, the respondent now has a history of prior disciplinary offenses. Specifically, the respondent has been previously disciplined on two occasions.

(1)    On June 17, 2011, the respondent entered into a diversion agreement with the disciplinary administrator's office. In the diversion agreement, the respondent stipulated that he violated KRPC 1.2 (scope of representation), KRPC 1.3 (diligence), KRPC 1.8 (conflict of interest), KRPC 1.15 (safekeeping property), KRPC 3.2 (expediting litigation), and KRPC 8.4 (professional misconduct).

(2)    On December 19, 2017, a deputy disciplinary administrator informally admonished the respondent for violating KRPC 1.3 (diligence), KRPC 1.4 (communication), KRPC 5.1 (responsibilities of supervising lawyers), and KRPC 5.3 (responsibilities regarding nonlawyer assistance).

"b. *Dishonest or Selfish Motive.* Throughout the extensive litigation on the matter and throughout the disciplinary proceedings, the respondent falsely characterized his role as a mere scrivener. Characterizing his role in this fashion was dishonest. The respondent (improperly) agreed to represent both sides to an agreement. By agreeing to represent A.M., he agreed to provide A.M. with independent and candid advice. Likewise, characterizing his role as a mere scrivener was also selfish. In so doing, the respondent sought to minimize his culpability in this matter. The respondent's dishonest and selfish motivation in this case is a considerable aggravating factor.

"c. *A Pattern of Misconduct.* Over the course of years, the respondent repeatedly falsely asserted that his role in the matter was that of a mere scrivener. Because the respondent repeatedly falsely asserted that he was a mere scrivener, he engaged in a pattern of misconduct.

"d. *Multiple Offenses.* The respondent committed multiple rule violations. The respondent violated KRPC 1.1 (competence), 1.2(c) (scope of representation), 1.7 (conflict of interest), 2.1 (exercise independent judgment), and 8.4(d) (conduct prejudicial to the administration of justice). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"e. *Refusal to Acknowledge Wrongful Nature of Conduct.* The respondent has refused to acknowledge any wrongdoing.

"f. *Vulnerability of Victim.* A.M. was vulnerable to the respondent's misconduct. He is not an attorney; he relied on the respondent to provide him independent professional judgment and candid advice.

"g. *Substantial Experience in the Practice of Law.* The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1987. At the time of the misconduct, the respondent had been practicing law for 17 years.

20

"81.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"a.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* While the respondent fully cooperated with the disciplinary process, the respondent did not acknowledge his transgressions.

"b.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The respondent is an active and productive member of the bar. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"c.     *Delay in Disciplinary Proceedings.* The respondent argued that there was a delay in the disciplinary proceedings. A.M. filed the complaint in 2016. While the litigation remaining pending, and at the request of the respondent, the case was put on hold until after the litigation was resolved. While the disciplinary complaint was not filed at the time of the misconduct, the disciplinary proceedings have not been delayed other than at the request of the respondent. This is not a mitigating factor.

"d.     *Imposition of Other Penalties or Sanctions.* The respondent settled the dispute with the bankruptcy trustee by paying $250,000. Additionally, following a five day jury trial, the respondent was found to be 20% liable for A.M.'s $171,000 loss.

"e.     *Remorse.* In his closing argument, counsel for the respondent referenced the respondent's remorse in this case. The hearing panel reviewed the transcript and found the following:

'A.     . . . In hindsight, I wish I would have ran. My crazy. I'm so sorry to everybody that I didn't. What I was trying to do, though, was

21

help two people who really wanted to do a deal together, if they came to terms, do a deal under the—under the boundaries of what I was doing. I was just doing what I was asked. Is that a good excuse? No, it's not. Should I have made calls, no I shouldn't have. I've kicked myself for the last 15 years I guess for that. So, no, I should have done things, but I didn't.'

"82.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32     Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'5.11     Disbarment is generally appropriate when:

. . . .

'(b)     a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

'5.13     Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'6.11     Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes

serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

*"Recommendation*

"83.    The disciplinary administrator recommended that the respondent be disbarred. Counsel for the respondent recommended that the respondent be reprimanded for the misconduct.

"84.    Based upon the findings of fact, conclusions of law, the Standards listed above, and *In re Callahan*, the hearing panel unanimously recommends that the respondent's license to practice law in Kansas be suspended for a period of one year.

"85.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do,

23

what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257) (a misconduct finding must be established by clear and convincing evidence). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint to which he filed an untimely answer without objection by the Disciplinary Administrator. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. Murphy filed exceptions to portions of the final hearing report. See Supreme Court Rule 212(c)(2) (2019 Kan. S. Ct. R. 261). We address those first.

*Exceptions to the panel's report*

> "When a respondent does not take exception to a finding it is deemed admitted. But when an exception is taken, the panel's findings are not typically deemed admitted, so the court must determine whether the disputed findings are supported by clear and convincing evidence. In making this determination, the court does not weigh conflicting evidence, assess witness credibility, or redetermine questions of fact. If a disputed finding is supported by clear and convincing evidence, it will not be disturbed. [Citations omitted.]" *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017).

Murphy took exception to 31 of the findings in the final hearing report: 2 of the panel's procedural history statements (Report, ¶¶ 10-11), 14 of the factual findings (Report, ¶¶ 16, 22, 25, 29, 31-33, 36, 38, 42, 44, 45, 49, 56), 7 of the legal conclusions (Report, ¶¶ 63, 64, 66, 67, 69, 70, 73), and 8 of the findings concerning the recommended discipline. (Report, ¶¶ 78, 79, 80.b-c., 80.f., 81.a., 81.c., 81.e.).

Most of the exceptions are incorporated into Murphy's amended brief, but some are not. A respondent who does not advance arguments in a brief that support exceptions to the final hearing report is deemed to have abandoned or waived those exceptions. *In re Owens*, 309 Kan. 80, 88, 431 P.3d 832 (2018). We hold Murphy has abandoned his exceptions to the final hearing report ¶¶ 10, 11, 25, 31, and 56, although by necessity aspects of each are included below.

The remaining exceptions are addressed in context when discussing the panel's findings, conclusions, and recommendation. We begin with KRPC 1.2(c) because it forms the basis for later findings on the other violations.

*Did Murphy Violate KRPC 1.2(c)?*

KRPC 1.2(c), as it existed in 2004, declared, "A lawyer may limit the objectives of the representation if the client consents after consultation." KRPC 1.2(c) (2003 Kan. Ct. R. Annot. 333). The panel concluded at ¶ 64 that Murphy violated KRPC 1.2(c) by limiting the scope of his representation without obtaining A.M.'s valid consent. Murphy concedes he violated KRPC within the context of his exceptions.

Murphy appears to assert A.M. consented to his limited representation, by alleging (1) "it was undisputed that respondent was [hired] to just draft the transaction agreement to reflect the agreement reached between A.H. and A.M."; and (2) "this is exactly how the parties acted and carried out the transaction." Seemingly, he argues there was an implicit understanding among the parties who signed the engagement letter that Murphy was serving simply as a scrivener and would not give legal advice.

25

But the evidence does not support Murphy's myopic view of his limited role in these transactions. Rather, as found by the panel, clear and convincing evidence supports his violation of KRPC 1.2(c).

First, his claim that the engagement letter "does not suggest respondent give legal advice to either party" and that "he was only retained to prepare the documents to memorialize the transaction" is flatly contrary to the letter's plain language. It provides:

> "*You hereby employ The Murphy Law Firm, P.A. to prepare all necessary documentation and advise both [A.H.], as the seller, and [A.M.], as the purchasers, of all of the capital stock of Kansas Express International, Inc., which is owned by [A.H.].* I have disclosed the potential conflicts in doing so; however, after acknowledging such conflicts you all agree to waive any such conflict and retain us nonetheless pursuant to the terms of this letter and the enclosed Standard Terms of Engagement. *Should a conflict arise which cannot be resolved, we will withdraw from this transaction with regard to all parties in this matter, and you should then retain your own legal counsel to advise you.*

> "*The legal fees* and expenses will be paid by you, jointly and severally . . . ."
(Emphases added.)

Nowhere does it state Murphy would act only as a scrivener and not offer legal advice to A.M. On its face, the letter states: "The Murphy Law Firm" was hired to "advise" both the seller and the buyer, and if "a conflict arise[s]," the clients were to retain their own legal counsel to advise them. In other words, according to the letter, he was being hired as an attorney to provide his legal advice up until the parties encountered some unresolvable conflict.

In the related bankruptcy proceeding, the court found "the provisions of the engagement letter could certainly have given a reasonable person in [A.M.]'s position the idea that Murphy was going to act as his and [A.H.]'s attorney for the transaction, and not

26

as a mere scrivener who would offer no legal advice." See Restatement (Third) of the Law Governing Lawyers § 18(2) (2000) ("A tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it."). The panel's conclusion is not only supported by the plain language, but also by A.M.'s testimony. See Restatement (Third) of the Law Governing Lawyers § 19, comment c (2000) ("[A]ny contract limiting the representation is construed from the standpoint of a reasonable client."). We agree.

And at the disciplinary hearing, A.M. testified there was no consultation about limiting the scope of Murphy's representation nor did A.M. consent to any limitation. When asked by the Disciplinary Administrator—"Did Mr. Murphy ever make any representations to you that I am providing no legal advice to you about this arrangement?"—A.M. answered, "Absolutely not." A.M. further noted he believed Murphy's representation included providing legal advice to him on "any circumstances that involved the agreement." This evidence shows how A.M. understood what Murphy was to do in representing A.M.'s interests.

Murphy even admitted at the hearing that he provided "a little bit of advice" and "made a couple of suggestions here and there" during his involvement. And the record reflects that before the bankruptcy issue arose, Murphy advised both A.M. and A.H. on the difference between an asset purchase and a stock purchase and recommended doing it as a stock purchase. Murphy also "made some general statements" about due diligence. And on the issue of the corporation's forfeited status, Murphy advised A.M. not to be concerned because it could be remedied before closing. That advice satisfied A.M. Also, when A.M. objected to including S.L.'s broker's commission in the agreement, Murphy disagreed and told A.M. it was relevant, customary, and for A.M.'s benefit.

27

Clear and convincing evidence exists to support the panel's conclusion that Murphy violated KRPC 1.2(c) by limiting the scope of his representation without A.M.'s consent after consultation.

*Did Murphy Violate KRPC 1.7?*

In 2004, KRPC 1.7 provided:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved." KRPC 1.7 (2003 Kan. Ct. R. Annot. 372).

The panel concluded Murphy violated KRPC 1.7(a) in two ways: First, at the beginning of the representation, there existed a directly adverse representation between

28

A.M. and A.H., but Murphy failed to satisfy the consent-after-consultation requirement under subsection (a)(2); and second, he "was placed on actual notice of a direct conflict of interest between his two clients" when he learned of A.H.'s bankruptcy, but Murphy continued to represent them without obtaining each client's consent after consultation under the same subsection. The panel also determined Murphy violated KRPC 1.7(b) upon a finding that he "never disclosed to A.M. his previous personal and professional relationship with S.L. and his previous professional relationship with IFC," which "may have materially limited [his] representation of A.M. in this case," and he failed to "explain the conflict to A.M. nor did he seek or obtain A.M.'s consent to this conflict." Murphy concedes violations of both subsections, although he again equivocates some on KRPC 1.7(a).

Since Murphy does not specifically challenge the subsection (b) violation involving S.L. and IFC, our analytical focus is on subsection (a). See Supreme Court Rule 212(c) (2019 Kan. S. Ct. R. 262) ("Any part of the hearing report not specifically excepted to shall be deemed admitted."); *In re Kupka*, 311 Kan. 193, 203, 458 P.3d 242 (2020) (issues deemed admitted when respondent "did not file exceptions to the hearing panel's final hearing report").

"[A] lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other." Comment 28 to KRPC 1.7 (2019 Kan. S. Ct. R. 313). "Directly adverse conflicts can also arise in transactional matters. For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer . . . ." Comment 7 to KRPC 1.7 (2019 Kan. S. Ct. R. 309). We hold the panel correctly determined Murphy's representation of both A.M. and A.H. in the sale of the limousine business amounted to a conflict and was prohibited unless each client consented after consultation. See *In re Hodge*, 307 Kan. at 219 (respondent violated KRPC 1.7[a] when simultaneously representing seller and buyer in the ranch

29

sale); *State v. Callahan*, 232 Kan. 136, 139-40, 652 P.2d 708 (1982) (holding a conflict of interest when a lawyer represented both sellers and purchaser in land sale transaction).

The panel concluded Murphy failed to provide "adequate consultation" for a valid consent as required by KRPC 1.7(a)(2). Murphy claimed in his exceptions that he obtained A.M.'s consent as evidenced by the engagement letter signed by A.M. He insists "the engagement letter specifically stated that in the event of a conflict, the parties would need to obtain separate counsel and the uncontroverted evidence reflected that both [parties] were advised by respondent to consult with separate [counsel] on several occasions." But that misses the point. The panel's finding is not about whether the parties consented in writing to obtaining separate counsel if a conflict occurred in the future, or whether they were advised in writing to consult with separate counsel. Rather, its finding is about Murphy's lack of adequate consultation prior to securing A.M.'s valid consent to the obvious potential conflict from Murphy's dual representation of both parties. See KRPC 1.0(c) (2019 Kan. S. Ct. R. 292) ("'Consult' or 'Consultation' denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.").

The evidence fully supports the panel's decision: A.M. testified Murphy "did not explain any potential conflict" and "spent seven to 20 seconds on that provision of the engagement letter and the gist of the conversation was that if A.H. and A.M. reached an impasse in the negotiations, they would each need to hire their own lawyer to complete the transaction." And Murphy does not take exception to this finding. As the Disciplinary Administrator notes, no explanation was offered "about the nature of the conflict itself, what conflicts could arise, how 'secrets' would be handled, or any other information a lay person would need to have explained to understand the true nature of the conflict and the significance of waiving it."

30

Comment 6 to KRPC 1.0 (2019 Kan. S. Ct. R. 294) states:

> "The communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent. The lawyer must make reasonable efforts to ensure that the client . . . possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client . . . of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's . . . options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel."

It is also noteworthy that the hearing panel found A.M.'s testimony more credible than Murphy's. See *In re Hodge*, 307 Kan. at 210 ("[T]he court does not weigh conflicting evidence, assess witness credibility, or redetermine questions of fact. If a disputed finding is supported by clear and convincing evidence, it will not be disturbed.").

Next, Murphy challenges the final hearing report ¶ 67, asserting that when he learned of the bankruptcy issue, he "[believed] them to be consenting to his continued work." But "a lawyer may not assume consent from a client's or other person's silence." Comment 7 to KRPC 1.0 (2019 Kan. S. Ct. R. 294). In his reply brief, Murphy concedes, "Unfortunately, when the Seller's bankruptcy came to light Respondent should have withdrawn." And Murphy admits he did not have the required consultation to obtain A.M.'s valid consent.

The evidence in the record and Murphy's concessions to this court support the panel's findings on his KRPC 1.7 violations.

31

*Did Murphy Violate KRPC 2.1?*

The panel determined Murphy did not exercise independent professional judgment and render candid advice to his client in violation of KRPC 2.1 (2019 Kan. S. Ct. R. 345). For support, it found: (1) his "judgment was influenced by the economic factors relevant to the entire situation, particularly so given his previous relationships with S.L.[] and IFC"; (2) he failed to advise A.M. of the potential and actual problems with entering both agreements; (3) his failure to comply with KRPC 2.1 was "particularly egregious after [he] learned of A.H.'s bankruptcy"; and (4) Murphy testified "he would not have advised 'an independent' client to proceed as A.M. proceeded because there are no barriers to enter the limousine service business." See KRPC 2.1 ("In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors that may be relevant to the client's situation.").

First, Murphy challenges the panel's conclusion that his representation was influenced by his relationships with S.L. and IFC. Murphy claims he received no consideration from them with regard to the transaction at issue. He admits S.L. asked him to draft a document for IFC but argues IFC did not hire him or pay him anything. But as correctly noted by the Disciplinary Administrator, there is ample evidence supporting the panel's finding that Murphy's relationships with the third parties would have influenced his independent professional judgment.

During the 2006 deposition prepared for A.H.'s bankruptcy case, the following colloquy occurred:

> "[Counsel for the trustee:] . . . [Y]ou've brought two other files, one labeled 'International Football Club, Inc., General Representation'; is that right?

32

"[Murphy:]  Yes.

. . . .

"[Murphy:]  . . . I got involved in the beginnings of [IFC]. It didn't go very far. At least, my involvement didn't go very far.

. . . .

"[Counsel for the trustee:]  Who were your client contacts for [IFC]?

"[Murphy:]  [B.S.] and [A.H.] and Preki[, who is a soccer player.]

. . . .

"[Counsel for the trustee:]  And how was it that you came to represent [IFC]? Were you referred by someone?

"[Murphy:]  Yes. [S.L.]

. . . .

"[Counsel for the trustee:]  What did you do for [IFC]?

"[Murphy:]  I was brought in basically to try to memorialize . . . an arrangement between the founding members, [including A.H.], as to the operation of the [IFC]. That never was finalized either, at least not with my involvement."

Murphy's testimony supports the panel's conclusion that he had a prior relationship with S.L. and IFC. Since A.H. was an IFC founding member, it appears Murphy's relationship with both influenced his representation in the transaction between A.H. and A.M. And the fact Murphy was not paid for his work drafting the IFC shareholder

33

agreement does not negate the existence of a lawyer-client relationship. See *In re Hodge*, 307 Kan. at 212 (existence of lawyer-client relationship is not dependent upon payment of a fee).

Second, Murphy concedes he had a previous relationship with S.L., who referred him business from time to time, including the IFC matter and the limousine sale matter. He attempts to minimize this relationship by stating "like most attorneys, [he] receives referrals from existing client[s] for new clients. That is what occurred here." But as correctly argued by the Disciplinary Administrator, "[t]his was not the common scenario where an existing client refers a potential client for representation on some unrelated matter. Here, there was an interconnected relationship between the parties and the transactions."

In the final hearing report, the panel found the following facts: A.H. and B.S. formed IFC. To raise capital for IFC, A.H. entered into an advisory fee agreement with B.C., a firm that raises capital for other companies. S.L. was the chief operating officer and 50% owner of B.C.; S.L. referred IFC to Murphy. Murphy became counsel for IFC. S.L. referred A.M. and A.H. to Murphy for the transaction at issue. And these facts are undisputed facts. For this it is easy to conclude S.L. not only had a financial interest in both transactions, but that S.L. benefited directly from the limousine sale. Murphy acted for S.L.'s benefit by including a provision for his brokerage fee in both agreements over A.M.'s objection by saying the commission was "relevant" and telling A.M. the provision was included for A.M.'s benefit.

Third, Murphy disputes the panel's finding that his conduct was "particularly egregious" after he learned of the bankruptcy matter. He insists the panel failed to consider that he referred both clients to separate counsel for independent advice on the situation immediately after hearing of A.H.'s bankruptcy. He claims the clients came back

34

later, announcing they had resolved the conflict, and directed Murphy to prepare a new agreement with terms and conditions they negotiated without Murphy. But Murphy's factual statements are unsupported by the evidence.

At that time, he did not refer A.M. to another counsel; he said he would, but he did not. Rather, Murphy told A.M. there was no other option but to restructure the agreement. Murphy "[n]ever" told A.M. he had the option to walk away "from this whole deal." Nevertheless, Murphy testified "he would not have advised 'an independent' client to proceed as A.M. proceeded . . . ." This shows he did not consider A.M. to be an "independent client" entitled to the duties owed any other clients. Murphy specifically told A.M. that "this was our only option" to avoid the bankruptcy problem.

Furthermore, and contrary to his assertion that he "ceased working on the transaction upon learning about the bankruptcy," and that none of the "terms and conditions were 'negotiated' by [him], but rather provided by the parties," his own testimony supports the panel's finding that he gave legal advice to the parties after the bankruptcy issue emerged. For instance, the evidence shows:  (1) Murphy told the clients there were no bankruptcy estate assets involved in the provision of services; (2) he said to the clients the company did not have any value, so they were only buying [A.H.]'s expertise and contacts; and (3) he helped A.H. and A.M. overcome the impasse on the price for the new "services" agreement by recommending adding an incentive payment provision that would reward A.H., if the company did better than A.M. expected.

We hold clear and convincing evidence exists to sustain the panel's conclusion that Murphy violated KRPC 2.1 by selectively giving advice and withholding advice in ways that benefitted the interests of A.H., S.L., and the IFC transaction, to the detriment of A.M.

35

*Did Murphy Violate KRPC 1.1?*

The panel concluded Murphy failed to provide competent representation to A.M. in the limousine business sale transaction, in violation of KRPC 1.1 (2019 Kan. S. Ct. R. 295). Under KRPC 1.1, "[c]ompetent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." For support, the panel noted: (1) Murphy failed to treat A.M. as an "independent client" and did not offer A.M. candid advice concerning the transaction; (2) he failed to become aware that A.H. had filed for bankruptcy and listed his business with a zero value; and (3) Murphy admitted that he was not familiar with bankruptcy law. Murphy acknowledged the KRPC 1.1 violation to this court, but again with some equivocation.

Our analysis will focus on the second and third findings because we addressed the panel's first finding above. Murphy argues that under the limited scope of his representation, he had no duty to know anything about A.H.'s business and no duty to discover the bankruptcy, but that once he learned about the bankruptcy matter, he acted competently by reviewing the case on PACER, seeking assistance from colleagues who practice in that area, and by referring both clients to separate counsel. He also claims he had enough bankruptcy knowledge to prepare the second agreement and the bankruptcy trustee "approved that document." Murphy repeatedly insists throughout his amended brief that the bankruptcy trustee "approved" the second agreement.

These positions clearly mischaracterize the evidence. The bankruptcy trustee only determined the second agreement was a contract for A.H.'s future services and, therefore, that payments to A.H. were not bankruptcy estate property. And that placation was only temporary, as it was accomplished by failing to disclose the first agreement. The adversary proceeding that followed resulted in the bankruptcy court's finding that the

36

funds paid under the second agreement were in fact for the business and were bankruptcy estate property.

Moreover, a review of the record Murphy references in support of his argument actually shows the second agreement "surprised" the trustee because of the dollar amount involved in that transaction. The trustee called A.H.'s bankruptcy attorney to find out what was going on. The trustee thought A.M. paying "$300,000" for A.H.'s "advice of how to run a limousine business . . . sound[ed] absolutely crazy" and did not "make any sense at all." In that context, the trustee further noted generally he does not have "any problem" when an agreement transfers no assets. But Federal District Judge Smith found "the [second agreement] contains many provisions one would expect to see only in a contract for the sale of a business or its assets." In short, the trustee did not "approve" the second agreement.

Murphy's assertion that he provided competent representation within the limited scope of his representation also fails for several reasons. First, as previously discussed, he failed to obtain a valid consent after consultation under KRPC 1.2(c) to the alleged limited scope. Second, even assuming he had satisfied KRPC 1.2(c)'s requirement, that consent would not have relieved him of the duty of competence owed A.M. See Comment 5 to KPRC 1.2 (2019 Kan. S. Ct. R. 297) ("[T]he client may not be asked to agree to representation so limited in scope as to violate Rule 1.1."). Third, Murphy conceded he "would have looked at the Kansas Secretary of State to see where the corporation was," and when "looking back, it might have been forfeited at the time for an administrative failure to file an annual report or something." See KRPC 1.1 (competent representation requires thoroughness and preparation reasonably necessary for the representation).

37

Finally, Murphy argues his effort to get advice from a bankruptcy colleague shows he acted competently. See Comment 1 to KRPC 1.1 (A lawyer who does not have the legal knowledge required for a particular matter may nonetheless provide competent representation by "associat[ing] or consult[ing] with . . . a lawyer of established competence in the field in question."); see also Comment 2 to KRPC 1.1 ("A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. . . . A lawyer can provide adequate representation in a wholly novel field through necessary study."). And Murphy concedes his primary area of practice was matters involving business transaction and business litigation.

But while he notes he "sought out consultation with regular bankruptcy practitioners," he does not cite to the record facts to support that argument. *In re Hawver*, 300 Kan. 1023, 1039, 339 P.3d 573 (2014) (respondent's argument deemed abandoned or waived if respondent's brief advances argument without proper citation to the record to support that claim). Importantly, the evidence shows Murphy did not consult with any bankruptcy colleagues before offering legal advice to his clients that their transaction should be restructured as a service agreement. And while he may have attempted to consult with a bankruptcy attorney, he went ahead and gave advice, saying A.M.'s only option was redrafting the agreement as one for services.

We hold clear and convincing evidence supports the panel's holding that Murphy failed to provide A.M. with the legal knowledge, skill, thoroughness, and preparation required by KRPC 1.1.

*Did Murphy Violate KRPC 8.4(d)?*

The panel determined that when Murphy drafted the second agreement in an attempt to circumvent the bankruptcy problem, he violated KRPC 8.4(d) (2019 Kan. S. Ct. R. 387) ("It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."). For support, the panel noted he "knew that the assets of the limousine service, regardless of their value, were part of the bankruptcy estate." The panel agreed with the bankruptcy court's finding that "attempting to restructure the deal was 'thinly disguised subterfuge designed to secure the transactions true nature; the artifice was specifically designed to skirt the bankruptcy law.'"

Murphy challenges the panel's conclusion by making the same unsubstantiated arguments he advanced on the other issues including that A.M. and A.H. independently negotiated the terms and conditions of the second agreement without Murphy's assistance, and again asserting that the "very agreement was approved by the bankruptcy trustee." The remaining contentions for this violation are:  (1) Murphy "belie[ved] that the second agreement did not involve bankruptcy estate asset"; and (2) the panel's reliance on the bankruptcy court's comment is "totally prejudicial" since he was not at that trial.

As to his first assertion, and contrary to what is stated in his amended brief, Murphy noted in his exceptions that "respondent *knew* that any assets of the limousine business would be bankruptcy estate asset." (Emphasis added.) And because he changed some language in the second agreement, he believed it "would not violate any bankruptcy law." But this just shows Murphy at least knew the new agreement skirted the law and restructured the contractual language to that effect. Moreover, the services agreement expressly included asset transfers, including the office leases, office furniture, and the

39

1999 Lincoln Town Car and 2001 Lincoln Navigator, although it stated the leases had no value.

Murphy also characterized the second agreement as an asset sale in a later agreement he drafted for A.H. involving the sale of the limousine business to Tess Limousine and Airport Services, Inc. This so-called Tess Agreement included a paragraph that referenced the previous agreement between A.H. and A.M. And that paragraph characterized the transaction as a sale of the limousine business and its assets:

> "A prior agreement had been entered into by [A.H.] with [A.M.] for the sale of [A.H.'s] business to [A.M.]; however, following the closing thereunder, on July 30, 2004 [A.M.] abandoned all assets to be acquired thereunder, and failed to take assignment of the office lease, and the leases on the subject vehicles of this Agreement, also making no payments on either the office lease or the vehicles."

Murphy's argument that the second agreement was not a business or asset sale, but merely a sale of services, contradicts how he described those same items in the Tess Agreement that he also drafted.

As to his second claim, this issue should be deemed abandoned because he raises it only incidentally and with no authority. See *In re Hawver*, 300 Kan. at 1039 (respondent's argument deemed abandoned or waived if respondent's brief advances no support of it). But even when we consider it, the overwhelming evidence supports the same conclusion the bankruptcy court reached. And the panel simply stated that it "agrees with the bankruptcy court" based upon the evidence and arguments provided by both parties.

Regardless, the evidence in the record shows what Murphy attempted to do ran afoul of bankruptcy law. And Norton testified the second agreement "clearly violates"

40

bankruptcy law, "probably constitutes a bankruptcy crime" and "is a sham agreement that . . . is an attempt to sell assets that . . . belong to . . . the trustee." Both Norton's and Murphy's testimony and the language in the first and second agreements, as well as the Tess Agreement, combine to provide clear and convincing evidence supporting the panel's conclusion that Murphy violated KRPC 8.4(d).

DISCIPLINE

Having found clear and convincing evidence that Murphy violated the Kansas Rules of Professional Conduct, all that remains is the task of imposing discipline. The violations are KRPC 1.1 (2019 Kan. S. Ct. R. 295) (competence), 1.2(c) (2003 Kan. Ct. R. Annot. 332) (scope of representation), 1.7 (2003 Kan. Ct. R. Annot. 372) (conflict of interest), 2.1 (2019 Kan. S. Ct. R. 345) (independent judgment), and 8.4(d) (2019 Kan. S. Ct. R. 387) (conduct prejudicial to the administration of justice).

The panel recommended Murphy's license be suspended for one year. In doing so, it relied upon *State v. Callahan*, 232 Kan. 136, 139-40, 652 P.2d 708 (1982). The panel found *Callahan* to be persuasive because of the factual similarities between the two cases. There, the court indefinitely suspended Callahan's license to practice law.

Murphy argues the panel's recommendation is excessive, suggesting reprimand is the appropriate discipline. Alternatively, he asserts that if the court determines suspension is appropriate, the suspension should be stayed, and he be placed on probation. The Disciplinary Administrator's office stands by its recommendation of disbarment. Alternatively, if the court determines a suspension is the appropriate discipline, it recommends the suspension be indefinite, or if a suspension for a shorter term is considered, that Murphy be required to undergo a hearing for reinstatement under Supreme Court Rule 219 (2019 Kan. S. Ct. R. 270).

41

The Disciplinary Administrator opposes probation noting Murphy failed to submit a probation plan to the hearing panel as required by Supreme Court Rule 211(g)(1) (2019 Kan. S. Ct. R. 259) ("If the Respondent intends to request that the Respondent be placed on probation for violating [KRPC] . . . , the Respondent shall provide each member of the Hearing panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least fourteen days prior to the hearing on the Formal Complaint."). In his reply brief, Murphy appends a copy of "PROPOSED PROBATION AND SUPERVISION PLAN." But that fails to comply with Rule 211(g) procedures. We agree with the Disciplinary Administrator and the request for probation is rejected.

The hearing panel's recommendations are advisory only and do not prevent us from imposing greater or lesser sanctions. Supreme Court Rule 212(f) (2019 Kan. S. Ct. R. 261); *In re Kline*, 298 Kan. 96, 212-13, 311 P.3d 321 (2013). "Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case." *In re Mintz*, 298 Kan. 897, 912, 317 P.3d 756 (2014).

In arriving at its recommendation, the panel found Murphy "knowingly and intentionally violated his duties." Murphy argues there is "no evidence" to sustain the panel's finding, stating the evidence was "at worst" that "he made a poor judgment, and may have been negligent" in representing both A.M. and A.H.

"The ABA Standards identify three mental states: 'intent,' the highest culpable mental state; 'knowledge,' the intermediate culpable mental state; and 'negligence,' the least culpable mental state. Under the ABA Standards, a lawyer acts intentionally when acting with the 'conscious objective or purpose to accomplish a particular result,' while a lawyer acts with knowledge when acting 'with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or

42

purpose to accomplish a particular result.' Finally, a lawyer acts negligently when failing 'to be aware . . . that a result will follow . . . .'" *In re Hawkins*, 304 Kan. 97, 141, 373 P.3d 718 (2016).

But the record is replete with the evidence showing Murphy violated his duties owed to A.M. at least with knowledge. For instance, he knowingly violated KRPC 1.1 when he did not consult with a bankruptcy attorney before advising A.M. and A.H. Murphy knowingly violated KRPC 1.2(c) and 1.7 when he was aware of the then-existing conflicts, and he repeatedly did not provide adequate consultation before and after he learned of the bankruptcy matter.

As to his violations of KRPC 2.1 and 8.4(d), the evidence strongly suggests he did so intentionally. As to KRPC 2.1, Murphy did not consider A.M. as an "independent client" and withheld advice and material information from A.M., to benefit the interests of A.H. and the third parties. He was acting with the conscious objective to accomplish the sale of the limousine business. Murphy intentionally did not advise A.M. there was another option, to walk away. Murphy admitted he "knew that any assets of the limousine business would be bankruptcy estate asset," but he nonetheless suggested the services agreement would not violate any bankruptcy law. He was acting to accomplish the transaction for the sale of A.H.'s limousine business.

The panel determined that as a result of Murphy's misconduct, he caused "actual, serious injury": A.M. paid A.H. $300,420 for the business which A.H. did not own and which A.H. had previously valued at $0; and A.M.'s litigation to recover his loss lasted nearly 15 years. While Murphy initially took an exception to this finding, he later chose "not [to] dispute in any way that there was injury as a result of his conduct." See *In re Hodge*, 307 Kan. at 209-10.

43

The panel also found seven aggravating factors: (1) Murphy had prior disciplinary offenses; (2) he was dishonest and had selfish motive; (3) he engaged in a pattern of misconduct; (4) he committed multiple rule violations; (5) he refused to acknowledge any wrongdoing; (6) A.M. was a vulnerable victim; and (7) he had substantial experience in the practice of law.

As to the first factor, the panel found that while Murphy "had not yet been disciplined at the time the misconduct occurred in this case, [he] now has a history of prior disciplinary offenses." Murphy did not take an exception to the factual finding that he had a history of previous disciplinary offenses, rather he claims those cases cannot be "prior" disciplinary because they occurred after the present case. In doing so, he offers no authority. But we have no difficulty including his disciplinary record as part of our consideration. See *In re Kenny*, 289 Kan. 851, 854, 856, 217 P.3d 36 (2009) (adopting the panel's finding of the prior-disciplinary-offenses factor when respondent's prior "case was dismissed").

With regard to the second factor, the panel determined Murphy "falsely characterized his role as a mere scrivener. Characterizing his role in this fashion was dishonest. . . . Likewise, characterizing his role as a mere scrivener was also selfish." Murphy counters that he believed his role as such "in good faith," and both clients consented to his limited representation. He also argues the panel is punishing him for advocating his position; but clear and convincing evidence supports the panel's finding and his argument has no merit.

For the third factor, the panel concluded Murphy engaged in a pattern of misconduct because he repeatedly and falsely insisted he was a mere scrivener. He contends his good-faith belief should not be considered as a pattern of misconduct. He argues that "[i]f he had a pattern of failing to communicate with his clients over the years,

that would be a pattern of misconduct," but his repeated assertions before the panel should not be. But this factor has been understood by this court to have broader meaning. See, e.g., *In re Holmes*, 307 Kan. 871, 888, 416 P.3d 143 (2018) (upholding the panel's finding of the pattern-of-misconduct factor when "respondent repeatedly provided false and misleading information to the disciplinary administrator's office regarding his knowledge of the suspension and the extent of his unauthorized practice of law"); *In re Nwakanma*, 306 Kan. 704, 754, 397 P.3d 403 (2017) ("'The respondent engaged in repeated dishonest conduct—in his practice and before the hearing panel.'").

As to the fourth, fifth, and seventh factors, clear and convincing evidence supports the panel's findings. See *In re Kenny*, 289 Kan. at 854 (practicing law for 10 years supports a finding of the substantial experience factor).

But, for the sixth factor, the panel's determination that A.M. was vulnerable to Murphy since he was not an attorney "alone is not sufficient for a vulnerability finding." *In re Hodge*, 307 Kan. at 234 ("This court previously has ruled a victim's inexperience with legal matters alone is not sufficient for a vulnerability finding.").

The panel found four mitigating circumstances:  (1) Murphy fully cooperated with the disciplinary process although he did not acknowledge his misconduct; (2) he "possesses a good character and reputation as evidenced by several letters received by the hearing panel"; (3) he settled the dispute with the bankruptcy trustee; and (4) he showed remorse. We hold clear and convincing evidence supports these four mitigating factors.

But the panel concluded the delay in bringing the disciplinary proceeding was not a mitigating factor. This is contrary to our caselaw. A.M. filed the complaint in 2016, which was 12 years after Murphy's misconduct occurred. And the delay factor covers instances in which "charges may become so stale that it would be inequitable to act upon

them." *In re Ratner*, 194 Kan. 362, 373, 399 P.2d 865 (1965) (six years of delay) (citing *In re Elliott*, 73 Kan. 151, 158, 84 P. 750 [1906] [taking 14 years to file charges "must at least be said that it is very stale"]).

In *In re Carson*, 252 Kan. 399, 410, 845 P.2d 47 (1993), the court held that to assert the delay as a defense, "there must be a showing of prejudice to the party asserting such delay as a defense." In his statement of exceptions, Murphy claims "[i]t is entirely reasonable for respondent not to remember every detail of the subject matter which took place 15 years in the past, and the contradiction stated by the panel is simply a reflection of the best recollection of respondent." While this statement was not provided before the panel, more than 10 years of the delay is an undisputed fact. That amount of delay can be considered prejudicial. See 252 Kan. at 410 ("The evidence presented in *Carson I* was not stale. The factual basis for the disciplinary proceeding was preserved when the memory of the witnesses was still fresh."). But in this case we hold any prejudice is not so overwhelming that it outweighs the aggravating factors.

*Murphy's misconduct merits suspension*

We conclude a suspension with a two-year term is the appropriate discipline. In arriving at this, we have considered the aggravating and mitigating circumstances described above, as well as the clear and convincing evidence that supports the panel's findings and conclusions. Attorneys who attempt dual representation of parties to a business transaction do so knowing they are entering an ethical minefield. And while it is possible with diligence to avoid a disastrous slip, this case is a textbook example of what not to do.

That said, the court is amenable to staying respondent's two-year suspension after the first year so long as he adheres to a probation plan approved by the Disciplinary Administrator's office during the second year of his suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Mark D. Murphy be and he is hereby suspended from the practice of law in the state of Kansas in accordance with Supreme Court Rule 203(a)(2) (2019 Kan. S. Ct. R. 240) for two years as of the date of the opinion.

IT IS FURTHER ORDERED that the above suspension will be stayed after the first year provided respondent enters into a probation plan approved by the Disciplinary Administrator's office that is applicable for the second year of suspension. Approval of a probation plan by that office is required before the stay of respondent's suspension can commence. The provisions of Kansas Supreme Court Rule 211(g) (2019 Kan. S. Ct. R. 257) (discharge from probation) apply.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2019 Kan. S. Ct. R. 268) (notice to clients, opposing counsel, and courts of record following suspension).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.

BEIER, J., not participating.

MICHAEL E. WARD, Senior Judge, assigned.[1]

_____

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 122,036 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Carol A. Beier.